BROWN v. ELECTRIC CO.

(Filed May 26, 1905.)

*Municipal Corporation—Rights in Streets and Sidewalks— Rights of Abutting Owners—Trees on Sidewalks—Erection of Electric Poles—Punitive Damages.*

1. The right acquired by a city by condemnation of a street and sidewalk is confined to the public necessity and to the uses for which property is taken or burdened with the easement and for any additional burden placed upon the servient tenement, compensation must be made.

2. The power of a city to confer upon the defendants a franchise to lay their tracks, erect their poles and string their wires along the streets or sidewalks cannot affect the right of abutting owners to demand compensation for any additional burden placed upon their property.

3. An abutting owner has property in shade trees standing along the sidewalk which the law will protect and they may not be removed except where their removal is necessary for the use of the street as a public highway.

4.  Authority granted by a city to the defendant electric company to remove a shade tree in front of plaintiff's home in order to put up its poles and wires does not justify the act of the defendant in removing the tree, the city having no power to deprive the plaintiff of his property for such purpose without compensation.

5. . In an action to recover damages for cutting down a shade tree in front of plaintiff's home where the evidence showed that it was not necessary to remove the tree, but was more convenient to place defendant's poles and string its wires with the tree out of the way, and it was cut down while the plaintiff was away from home and over the protest of his wife, *held*, that the plaintiff was entitled to demand punitive damages.

ACTION by B. C. Brown and wife against Asheville Electric Company and others, heard by *Judge M. H. Justice* and a jury, at the September Term, 1904, of the Superior Court of BUNCOMBE County. From a judgment for the plaintiffs, the defendants appealed.

*Frank Carter* and *H. C. Chedester* for the plaintiffs.
*J. C. Martin* and *F. A. Sondley* for the defendants.

CONNOR, J.   For the purpose of disposing of the questions presented upon this record, we may take certain propositions as settled.  The land over which are the street and sidewalk upon which plaintiffs reside was the property of the grantor of the plaintiffs.  By condemnation proceedings duly had, the City of Asheville acquired an easement over said land for the purpose of enabling it to open and maintain a public street and sidewalk for the use of the citizens of Asheville. That the fee to said land remained in the owner and was granted to plaintiffs, together with the lot, to the outer edge of the sidewalk.  The tree, cut down by the defendants, stood upon the sidewalk on the outer edge and was not a nuisance to, or interference with the public use of the sidewalk.   That the city by its charter and amendments thereto had control of the street and sidewalk with all of the powers in regard to

the use thereof and of removing obstructions therefrom neces-
sary and convenient to that end. That such powers included
the right to cut down and remove this or any other tree, on
the street or sidewalk which, in the judgment of the city
authorities, was a nuisance to or an obstruction of the public
in the use of the street and sidewalk. That said tree af-
forded shade to the premises and residence of plaintiffs, and
its removal depreciated the value of plaintiffs' property to
the extent of $499 as found by the jury. In view of His
Honor's instruction to the jury we must assume that the jury
found, and we find ample reason to justify such finding, that
the defendant Electric Light Co., with the permission of
the Superintendent of Streets of the City of Asheville, after-
wards approved by the Board of Aldermen, removed the tree
for the purpose of more conveniently erecting its poles and
stringing its electric wires along the street. His Honor thus
stated the contention on the part of the defendants: "The de-
fendants contend that they had the right to cut down this tree,
on account of the fact that the land was condemned for a
street, that they had the right to cut it down for any pur-
pose, and especially that they had the right to cut it down
for the purpose of allowing electric light wires to pass there
which they say was for the benefit of the public. The court
charges you that if that was the purpose and the city allowed
the corporations that ran the electric light wires and the rail-
road company to do so more conveniently, then it would be
your duty to answer the first issue 'Yes.' The city would not
have the right, as the court views the matter, to cut down
that tree for the purpose of appropriating that part of the
land for the use of the defendants, unless the condemnation
was for the purpose of the city and they would not have the
right to go there and cut down the tree, unless they were
going to use it for the purpose for which it was condemned."
Before discussing the exceptions which challenge the correct-
ness of this and other instructions involving the same prin-

ciple, it is proper to say that by an amendment to the charter of the city made subsequent to the condemnation of the land for a street and sidewalk, the city authorities were given power to permit the erection of telegraph, electric light poles and wires, etc., on and over the public streets of said city. This power, of course, in no manner affects the rights of abutting owners. The legislature could not have intended, because it had no authority to confer such power to be exercised in violation of such private rights. It simply empowered the aldermen to grant the franchise over the streets of the city, subject of course to the rights of the citizen in respect to his private property. The legislature had no power itself to empower corporations to appropriate private property without compensation and of course could not authorize the city to do so. *C. & P. Tel. Co. v. McKenzie,* 74 Md., 36. There are a large number of exceptions to His Honor's charge, both in respect to instructions given and refused. We do not deem it necessary to pass upon all of them because in our view of the case, assuming the facts to be. as contended by defendants, we find no error in the record. Conceding to the City of Asheville the largest possible powers in respect to the opening and controlling its public streets, they must all be construed and exercised within the well defined limitation that they are held and to be used as a public trust for the benefit of the citizens of Asheville and not for the convenience, or even the necessities of private persons or corporations. In speaking of the exercise of this power, the New York Court says: "But we think it cannot, under guise of exercising this power, appropriate a part of the street to the exclusive, or practically to the exclusive, use of a railroad company, so as to cut off abutting owners from the use of any part of the street without making compensation for the injury sustained." *Reining v. N. Y. L. & W. R. R. Co.,* 128 N. Y., 168.

As the question is one of much practical importance to the

BROWN *v.* ELECTRIC CO.

people of the State, we will endeavor to mark the line which limits the power of municipal and *quasi* public corporations, or private corporations engaged in public service in interfering with the rights of abutting owners upon streets and highways.  This court has, in *Tate v. Greensboro,* 114 N. C., 392, defined the power which the duly constituted city authorities have in opening, widening, using and controlling public streets.  That this power, when exercised for the purpose and objects for which it is granted and in good faith, is not subject to the supervision of the courts, is well decided in that case.  We have no disposition to bring that decision, or anything said therein, into question.  We adopt what is said by *Mr. Justice Burwell* as stating the principle upon which our decision is based.  "It is not to be denied that the abutting proprietor has rights as an individual in the street in his front as contra-distinguished from his rights therein as a member of the corporation or one of the public.  The trees standing in the street along the sidewalk are, in a restricted sense, his trees.  If they are cut or injured by an individual who has no authority from the city to cut or remove them, he may recover damages of such individual.  His property in them is such that the law will protect it from the act of such wrong doer and trespasser."  Where it is said, "who has no authority from the city," it is meant, no lawful authority, because, as we shall see, the city has no power to confer authority except in the manner and for the purpose for which it may do the act itself.  Many of the decisions discussing the right of abutting owners upon streets and highways make a distinction between owners holding the fee in the land and those who have only such rights as accrue from their location on the side of the street.  It is conceded that the fee to the land upon which the sidewalk is located, and the abutting lot, is in the plaintiff; we shall discuss the case from that view.  The condemnation for a street and sidewalk therefore gave to the city an easement, the limit and extent of which,

both in respect to the use and the time of its enjoyment, is measured by the public necessity. "Where an easement only is taken for a public highway, the public acquires a paramount right to use and improve the land taken for highway purposes, which includes, not only the right of passage, but such other incidental uses as have been immemorially accustomed to be made of public highways, such as the laying of sewers, gas and water pipes and the like." 2 Lewis Em. Dom., sec. 589; *Barney v. Keokuk,* 94 U. S., 324. This court has uniformly held that the right acquired by condemnation is confined to the public necessity and to the uses for which property is taken or burdened with the easement; that for any additional burden placed upon the servient tenement, compensation must be made. *Story v. N. Y. Elec. R. R.,* 90 N. Y., 122; *While v. Railroad,* 113 N. C., 610; *Phillips v. Telegraph Co.,* 130 N. C., 513; *Hodges v. Tel. Co.,* 133 N. C., 225. Such conflict as may be found in the decisions arises out of the application of the principle. It is uniformly held that an easement acquired for one purpose either by grant, dedication or condemnation, cannot be appropriated to another purpose. "It is certainly well settled that where a grant is made or trust created for a specific and defined purpose, the subject of the grant or trust cannot be used for another purpose without the consent of the party from whom it was derived, or for whose benefit it was created. We are not considering the right of the corporation to part with whatever interest it possessed under the dedication and trust, but the power of the corporation under the Legislature to deprive the owner of a lot fronting on land so dedicated. * * * It cannot be successfully contended either that the dedication of land for a highway gives to the public an unlimited use, or that the Legislature have the power to encroach upon the reserved rights of the owner, by materially enlarging or changing the nature of the public easement." *Elevated R. R. case, supra.*

In respect to an easement acquired by condemnation the reason is obvious; in assessing compensation the commissioners are restricted to such damages as are incident to the specific use for which the condemnation is made. While the city authorities had ample power to confer upon the defendants a franchise to lay their tracks, erect their poles and string their wires along the streets or sidewalks, if such franchise did not materially restrict or interfere with the public use for which it was held in trust, such power could not affect the right of abutting owners to demand compensation for any additional burden imposed upon their property. The fact that the defendant corporation was operating a public utility does not affect the question. The only difference being, that if the city conferred the privilege upon a private citizen or corporation operating a private business and its enjoyment interfered with the right of an abutting owner, no right to continue the use of the privilege could be acquired except by grant; whereas, if the person or corporation is conducting a business concerning the public—one conferring the right of eminent domain—the right to use the franchise or privilege may be acquired by condemnation, and paying the abutting owner compensation for the additional burden. The doctrine is well stated in *Reining v. N. Y. L. & W. R. R. Co.,* *supra.* "It is quite probable that the general interests of B and of the larger public, are promoted by this appropriation of the streets, but it by no means follows that a lot owner whose property is injured should bear the loss for the public benefit. * * * The power conferred by the charter of B upon the common council to permit the track of a railroad to be laid in, along or across any street or public ground must be construed as subject to the qualification that no property rights of abutting owners are thereby invaded." In the same case, *Gray J.,* concurring, said: "Here the object was to subserve the railroad use, and the appropriation of this embankment is practically exclusive. The street was subjected

to a new use, with consequences as direct, in the permanent deprivation of the abutting property owners appurtenant easement, as though the railroad was operated in front of his premises upon a structure physically incapable of other uses." In *Eels v. A. T. & T. Co.,* 143 N. Y., 133, *Peckham, J.,* says: "We think neither the State nor its corporation can appropriate any portion of the public highway permanently to its own special, continuous and exclusive use by setting up poles therein, although the purpose for which they are to be applied is to string wires thereon and thus transmit messages for all the public at a reasonable compensation. It may be at once admitted that the purpose is a public one, although for the private gain of a corporation, but the Constitution provides that private property shall not be taken for public use without compensation to the owner. Where land is dedicated or taken for a public highway, the question is, what are the uses implied in such dedication or taking. Primarily, there can be no doubt that the use is for passage over the highway. The title to the fee of the highway generally remains in the adjoining owner, and he retains the ownership of the land, subject only to the public easement." To impose any different or additional burden without compensation, cannot be done by the Legislature either directly or by granting the power to a city. We cannot assume that it was intended to do so. Such intent is not to be gathered from the statute. *White v. Railroad, supra.* The question is exhaustively discussed in *Story v. N. Y. El. R. R., supra.* There is some conflict of judicial opinion in respect to what constitutes an additional burden. The Supreme Court of Maryland in *C. & T. Tel. Co. v. McKenzie,* 74 Md., 36 (47), says: "And so the condemnation of private property for a highway subjects the land so taken merely to an easement in favor of the public and does not divest the owner of the fee. Planting telephone or telegraph posts upon a public highway in the country is an appropriation of private property and un-

lawful unless the right to do so is acquired by contract or condemnation." After discussing the rights of the public in the street, the court proceeds to say: "Subject to these and other like rights in the municipality and the public to the use of the street *for street purposes,* the owner of the fee in the bed of the street possesses the same right to demand compensation, for additional servitudes placed thereon, that the owner of the bed of a highway in the country is entitled to. If then the fee of the bed of the street be in the appellee, the planting of the pole was an additional servitude imposed upon her land for which she could claim compensation and the Act of the Assembly could not deprive her of it." In *Broome v. Tel. Co.,* 42 N. J. Eq., 141 (2 Am. Elec. Cases, 259), the *Chancellor* says: "In order to justify the defendants in setting up the poles, it is necessary for them to show that they have acquired the right to do so, either by consent or condemnation, from the owner of the soil. The designation by the city or town authorities of the streets where the poles may be set up, is not enough." The same view is held in *B. T. Tel. Co. v. Barnett,* 107 Ill., 507 (1 Am. Elec. Cases, 565). That was an action of trespass, as the one before us. It appeared that in addition to putting the poles upon the highway, in which plaintiff owned the fee, the employees of the company "cut away the hedge because it was in their way and they also cut down two hedge trees." The court said: "The position taken by the defendant is that the State can rightfully, as it has done, authorize the county board to permit defendant to construct its line of telegraph upon the highway without consent of the abutting land owner; that it imposes no new or additional burden thereon and that when the public acquire an easement over land, for a compensation fully made, the public obtain all the rights the land owner had and the State may authorize any usage of it not inconsistent with its use as a highway." After stating the contention of the land owner, the court says: "The latter position is the one

best sustained by authority and rests on sounder principles.
\* \* \* The principle is, neither the State nor a municipal
corporation has any rightful authority, under the Constitu-
tion, to grant away the private property of the citizen, and if
corporations *quasi* public, in the exercise of the right of emi-
nent domain with which they are clothed by the sovereign
power of the State, seek to appropriate it so that they may
have a benefit therefrom, every principle of justice demands
that they should make just compensation whether the prop-
erty taken is of little or great value.   But aside from all con-
siderations of right and justice, the Constitution has so de-
clared, and its mandate in that respect may not be disre-
garded." *Ind. B. & W. R. R. v. Hartley,* 67 Ill., 439 ; *Wills
v. Erie, T. & T. Co.,* 37 Minn., 347 ; *Stowers v. Postal Tel.
Co.,* (Miss.), 3 Am. Elec. Cases, 855 ; Joyce on Elec. Law,
sec. 321.   That shade trees may not be removed except when
necessary for the use of the street to the public is well settled.
Lewis Em. Dom., sec. 132.   There are some authorities to the
contrary, but we think the view taken by those cited the
sound one.   We have no hesitation in holding that assuming
that the Board of Aldermen of the City of Asheville had
met and formally granted to the defendants authority to
remove the tree, finding that its removal was necessary to
put-up its poles and wires either for the electric light or
street railway, upon and along the sidewalk, such action
would not have justified the act of defendants.   It was not
within the power of the city to deprive the plaintiff of his
property for such purpose without compensation.   We find,
however, no averment or evidence that it was necessary to re-
move the tree.   It is suggested that it was more convenient
to place the poles and string the wires with the tree out of the
way.   This falls far short of the essential conditions upon
which private property may be taken, or burdens imposed
upon it.   The right of eminent domain has been so freely
conferred upon corporations, upon the mere suggestion that

their business is in some way connected with service to the public, that we are in danger of forgetting that it is one of the most delicate and dangerous powers conferred by the people upon their government. Public franchises have been so generously and lavishly conferred and so freely used without compensation, that those who wish to enjoy them forget that one of the chief ends for which government is created and taxes paid is the protection of private property—and then only with compensation. The record in this case shows that a valuable right of property affecting the comfort, health and welfare of the citizen and his family has been taken upon the suggestion of a private corporation to the Superintendent of Streets, without enquiry by the Board of Aldermen, notice to the plaintiff or any opportunity to be heard in defense of his rights. No person shall be deprived of his property, except by the law of the land, or due process of law—which has been defined to mean the right to be heard —before he or his property is condemned. This sacred right is binding upon every department of the government and all of its agencies, including municipal and private corporations.

While it is held in *Tate v. Greensboro, supra,* that the power to remove shade trees, where their removal is necessary for the use of the street as a public highway, may be conferred upon the Street Committee, it would be more in accordance with due and orderly procedure to do so only after due notice to the owner and a hearing before the legislative body of the city. The tree was cut on March 21, 1901. This action was brought on July 5, 1901. On September 16, 1904, the Board of Alderman adopted a resolution reciting that the action of three corporations named "or one or more of them in cutting down and removing the tree in front of the place then owned and occupied by B. C. Brown, etc., some years ago in putting a line of street railway and appurtenances upon said street in front of said property, or replacing thereon certain light wires be and is hereby ratified

BROWN *v.* ELECTRIC CO.

and confirmed, said tree having been so cut and removed by direction of the proper authorities of the said city." It is evident that at the time of the passage of this resolution, the Board were not certain to what corporation the power was given to cut the tree, or for what purpose it was conferred. It is not suggested in the resolution that it was necessary to remove the tree—or that it interfered with the street railway or the light wires. Indeed, it is apparent that the Board knew but little about the matter which they "ratified and confirmed." We have discussed the case upon the assumption that the tree was on the sidewalk. The testimony shows that while the condemnation took place in 1892, the land had never been used as a sidewalk. The plaintiff testified, without contradiction, that he had at the time the tree was cut lived at the place six years and "there had never been any sidewalk there." The tree was removed in March, 1901, and the hole out of which it was taken "about ten feet square," was open at the time of the trial. The testimony further shows that the tree was cut by the superintendent of the defendant companies, while Mr. Brown was away from home; that his wife phoned him, and he directed her to forbid the removal of the tree, the parties gave no heed to her request and that in some way the wires connecting the phone were cut.

We are impressed with the wisdom of the words of *Judge Peckham* in concluding his opinion in *Eels v. A. T. & T. Co., supra.* Referring to the argument that cases of this character should be decided with reference to the wants of an advancing civilization, which is doing so much to render life more comfortable and attractive, he says: "Let the defendants pay the owners for the value of the use it makes of the land outside and beyond the public easement in the highway and the necessity of the broader decision is done away with. It has the power to take the land upon making com-

Brown *v.* Electric Co.

pensation, and hence the refusal of the owner will not stop the proposed undertaking."

We have carefully examined the record and the exceptions to His Honor's rulings. We find no error of which the defendant can complain. We are of the opinion that the allegations were sufficient to entitle the plaintiff to demand exemplary and punitive damages and the testimony shows ample ground upon which to base the claim. In the entire transaction there was on the part of the defendants a painful disregard of the rights of the plaintiff. While extensive powers and wide discretion are given municipal authorities for the discharge of their duty to the public, it should always be borne in mind by those who serve in public positions that in our system of government there is no room or place for arbitrary power. The law which is a rule of action for the citizen is equally so for the official. Every man when his right of person or property is invaded has a right, and it is his duty to demand *"Quo Warranto."*

The judgment must be

Affirmed.