## DANIELS v. HOMER.

(Filed October 17, 1905).

*Fish and Fisheries—Police Power—Abatement of Nuisance—Seizure and Sale of Nets—Constitutional Law.*

1. Chapter 292 of the Acts of 1905, making it unlawful to set or fish any nets in certain sections of Albemarle and Pamlico Sounds, from January 15 to May 15 in each year, and providing that any person who shall violate said act shall be guilty of a misdemeanor, and further providing that the Oyster Commissioner shall seize all nets setting or being used in violation of said act, sell the same at public auction and apply the proceeds to the payment of cost of removal and pay any balance to the school fund, is a constitutional exercise of the police power.

2. There is no individual or property right of fishery in the waters of Albemarle and Pamlico Sounds, but such right rests in the State, and is subject absolutely to such regulations as the General Assembly may prescribe and can be exercised only at such times and by such methods as it may see fit to permit.

3. Fishing in waters when prohibited by law is a public nuisance and the General Assembly has the power to authorize a prompt abatement of the nuisance by seizure and sale of the nets subject to the right of their owner to contest the fact of his violation of the law by a proceeding of claim and delivery, or by injunction to prevent sale, or by action to recover the proceeds of sale and damages.

CONNOR and WALKER, JJ., dissenting.

ACTION by B. T. Daniels against J. Q. Homer, heard by *Judge G. W. Ward,* upon an agreed state of facts, at the Spring Term, 1905, of the Superior Court of DARE County. From a judgment in favor of the defendant, the plaintiff appealed.

*B. G. Crisp, Aydlett & Ehringhaus* and *Gilliam & Gilliam* for the plaintiff.
*W. M. Bond* for the defendant.

DANIELS *v.* HOMER.

CLARK, C. J.   The General Assembly of 1905 enacted chapter 292, "To regulate fishing in Albemarle and Pamlico Sounds and waters connected with them."   The first five sections of that chapter define and regulate the manner of fishing in various sections of the sounds.   Section 6 (marked 5 in the printed act) is as follows: "That it shall be unlawful for any person to set or fish any net or appliance of any kind for catching fish within one mile on north or south side of a line five miles long, running west from center of New Inlet or Oregon Inlet, or on north or south side of a line five miles long, running northwest from center of Hatteras Inlet."   Section 7 makes the act operative only from January 15, to May 15, in each year—a "close" season of four months.   We were told on the argument, and it was not controverted, besides it is a matter of common knowledge, that no small part of the sustenance and business interest of the people living adjacent to Albemarle and Pamlico Sounds and the waters connected therewith, are dependent upon catching fish, whose supply has so greatly decreased that the United States Government has established and is operating at large expense, a fish hatchery at Edenton for the purpose of putting into the waters of Albemarle Sound millions of young shad and other fish each year, to replenish the diminishing supply; that the habit of the fish is to go out to sea and at the end of three years they return to the waters where they were liberated for the purpose of spawning, and that if nets are set across the inlets through which they return, the fish are either caught or detained beyond the spawning season and the supply of fish in Albemarle and Pamlico Sounds and connecting waters will be thereby almost entirely destroyed and the Government hatchery at Edenton will become a useless expense and will doubtless be abandoned.

With a view of protecting the rights of the public against the cupidity of those who for their own profit would "kill the goose that lays the golden egg" for the benefit of a whole sec-

tion of the State, whose people are so largely interested in the fish industry, the General Assembly of 1905 enacted the above named chapter, creating a close season of four months during which the fish may freely return to our waters to lay their eggs, and for the purpose of enforcing its execution, when the profits arising from its violation would be a great temptation thereto, deemed it necessary to enact sections 8 and 9 of said act as follows: "Sec. 8. That any person who shall violate any section or provision of this act shall be guilty of a misdemeanor, and upon conviction in any county opposite the place at which said act is done shall be fined or imprisoned at the discretion of the court."

And inasmuch as pending trial and conviction, the destruction of the fish would go on to the great profit of the violators and to the irreparable injury of the public, the General Assembly thought proper to add to the abatement of the nuisance the penalty of the loss of the nets—the means by which the law was violated—in the following: "Sec. 9. That it shall be the duty of the Oyster Commissioner or Assistant Oyster Commissioner, whenever an affidavit is delivered to him, stating that affiant is informed and believes that said act is being violated at any particular place, to go himself or send a deputy to such place, investigate the same, and they shall seize and remove all nets or other appliances setting or being used in violation of this act, sell the same at public auction, and apply proceeds of sale to payment of cost and expenses of such removal, and pay any balance remaining to the school fund of county nearest to where offense is committed."

An affidavit by fourteen citizens having been made 25 March, 1905, that B. T. Daniels was violating the aforesaid act by setting two nets in the waters of Pamlico Sound at the end of Croatan Sound, and also east of Roanoke Marshes Light House (where the fish returning to the sound through Hatteras Inlet would be caught during the "close" season pro-

vided by law), the defendant, the Assistant Oyster Commissioner, notified said Daniels that he would seize said nets on 1 May, which nets were in water where the aforesaid law prohibited the setting or fishing said nets (as the plaintiff admits), and against the protest of said Daniels, did take said nets out of the water and placed them on shore under guard, whereupon this proceeding for claim and delivery for the nets was instituted. The defendant avowed his purpose to sell the said nets and apply the proceeds to the cost of seizing and removing the same, and apply the surplus of the proceeds, if any, to the school fund of the county as provided by said act.

There is no individual or property right to fishery in the waters mentioned in the act. The right of fishery, as well as hunting, rests in the State, and is subject absolutely to such regulations as the General Assembly may prescribe, and can be exercised only at such times and by such methods as it may see fit to permit. *Hettrick v. Page,* 82 N. C., 65 ; *Rea v. Hampton,* 101 N. C., 51; *State v. Gallop,* 126 N. C., and cases there cited at page 983 ; and this right may be exercised a marine league out to sea, *Manchester v. Mass.,* 139 U. S., 240 ; and citizens of other States may be excluded, *McCready v. Va.,* 94 U. S., 391. As the plaintiff admits his nets were set in waters forbidden by the act, his counsel admitted that the seizure was legal, but denied the right of the defendant to sell the nets as provided in the statute. But the State was sole judge of the penalty it should impose for a violation of its laws. It thought proper here to make the loss of the instruments used in such violation a part of the penalty, possibly to prevent a repetition of the offense, or as a surer deterrent of its commission.

The plaintiff contends that though his property is admitted by him to have been used in violation of law at the time of seizure, that the statute imposing as a penalty the loss of such property is unconstitutional in that there was no pre-

vious notice and trial. But as the General Assembly could prescribe the loss of the nets as a penalty, and the offense is admitted, there is nothing to try. As was said in *Rea v. Hampton,* 101 N. C., at p. 55, "As the Legislature had the undoubted right to regulate the manner in which the right of fishing in Albemarle Sound should be exercised, the plaintiffs had no *right* to fish in its waters in any mode not allowed by law. The facts found show that they were fishing in violation of law, and it would be singular if they could ask the *law* to protect them in its violation." In *Rose v. Hardie,* 98 N. C., 44, a town ordinance was held valid which authorized all hogs running at large to be impounded and sold for the costs *and penalty.* Here the State made the penalty the forfeiture of the article used in violation of the act. In *Mowery v. Salisbury,* 82 N. C., 175, a town ordinance was sustained which made the penalty for failure to pay the tax on a dog the right to kill the dog. At common law any personal chattel that even accidentally caused the death of a rational being was forfeited to the sovereign and sold and the proceeds distributed to the poor, as a cart that ran over a person, a weapon and the like. They were styled deodands. 1 Blk. Com., 300. And no trial or conviction of any person was necessary.

But the plaintiff contends that he might not have been using his nets in forbidden water, and if so, he was entitled to have that question determined by a jury trial before his nets were sold. As the plaintiff admits that his nets were so being used on this occasion, the proposition becomes a mere academic question in this case. In view, however, of the importance of the matter being settled, and in accordance with the wishes of the parties, we pass upon the legal point raised.

It was not seriously controverted, and could not be, that an abatement of a nuisance must be summary and that a seizure can take place before any adjudication by legal process, the party having his remedy by proper proceedings for an illegal

seizure.  In *Hellrick v. Page*, 82 N. C., 65, *Smith, C. J.*, held that fishing in waters, when prohibited by law was a public nuisance, and even a private individual if injured thereby, or indeed any one else, may remove the impediment.

But the plaintiff insists that before his nets are sold he is entitled to have the fact determined, by a court, whether he has incurred the penalty by doing the illegal act.  So he has, but it can be asserted in this very action to recover the nets before sale, or after sale by an action to recover the proceeds of sale or damages, or upon advertisement of sale, an injunction to prevent the sale.  He has his full remedy, but it does not include a continuance of the nuisance to his individual profit and the public detriment while the question of violation of the statute is being determined.  The identical point has been determined, and by courts of the highest authority. By a statute in New York, very similar to ours, passed in 1880, fishing at certain places was prohibited and made punishable as a misdemeanor.  This not proving sufficiently effective, an amendment in 1883 authorized any person to "abate and summarily destroy," and it was made the duty of any game constable to "seize, and remove and forthwith destroy" any "net, pound or other means or device for taking or capturing fish" in violation of any law, then or thereafter enacted, for the protection of fish.  In the Court of Appeals of New York, *Lawton v. Steele,* 119 N. Y., 226, (s. c., 7 L. R. A., 134), the act was held constitutional, affirming the court at General Term.  Upon writ of error to the U. S. Supreme Court, this was again affirmed, *Lawton v. Steele,* 152 U. S., 133, the court holding that the authority to summarily destroy nets used in violation of the law for the protection of fish, "is a lawful exercise of the police power of the State and does not deprive the citizen of his property without due process of law."  After stating the absolute power of the Legislature to regulate fishing and to provide for the protection of fish, the court says: "Nor is a person whose property

is seized under the act in question, without his legal remedy.
If in fact his property has been used in violation of the act,
he has no just reason to complain; if not, he may replevy his
nets from the officer seizing them, or if they have been
destroyed, may have his action for their value. In such cases
the burden would be upon the defendant to prove a justifica-
tion under the statute. As was said by the Supreme Court
of New Jersey in a similar case, *Am. Print Works v. Law-
rence*, 21 N. J. L., 248, 259, the party is not, in point of
fact, deprived of a trial by jury. The evidence necessary to
sustain the defense is changed. Even if the party were
deprived of a trial by jury, the statute is not, therefore,
necessarily unconstitutional. Indeed, it is scarcely possible
that any actual injustice could be done in the practical ad-
ministration of the act." This decision by the court charged
as the final tribunal, with the construction and enforcement
of the Fourteenth Amendment, should be conclusive.

The U. S. Supreme Court (152 U. S., 142,) further says:
"It is said, however, that the nets are not in themselves a nui-
sance, but are perfectly lawful acts of manufacture and are
ordinarily used for a lawful purpose. This, however, is by
no means a conclusive answer. Many articles, such for
instance as cards, dice and other articles used for gambling
purposes, are perfectly harmless in themselves, but may
become nuisances by being put to an illegal use, and in such
cases fall within the ban of the law and may be summarily
destroyed. * * * The power of the Legislature to declare
that which is perfectly innocent in itself to be unlawful, is
beyond question (*People v. West,* 106 N. Y., 293,) and in
such case the Legislature may annex to the prohibited act all
the incidents of a criminal offense, including the destruction
of property denounced by it as a public nuisance." It fur-
ther cites to same purport, *Weller v. Snover,* 42 N. J. L., 341,
and *Williams v. Blackwell,* 2 H. & C., 33, which sustained
acts for the summary destruction of fish baskets and traps

used to catch fish contrary to law. *Lawton v. Steele* has since been cited for this proposition as authority by a unanimous court. *Sentell v. Railroad,* 166 U. S., at p. 705.

Our Code, sections 1049, 1051, 1052 authorizes any police officer, constable, sheriff, justice of the peace, to summarily destroy any gaming table, etc., and the seizure of any money staked (which is not a nuisance *per se,* any more than the fishing net), one-half to belong to the person seizing it, and the other half to the poor of the county. This is cited by *Dick, J.,* in *North Carolina v. Vanderford,* 35 Fed., 286, in sustaining the summary seizure and destruction of a barrel of "blockade" whiskey, and a similar statute was held constitutional. *Garland v. State,* 71 Ark., 138.

Certainly gambling in the back room of some village hotel, or private house, or stable loft, is not as injurious as the destruction of the fishing industry, upon which depends to a large extent the prosperity of twenty counties, and whose importance has attracted the attention of the Federal Government and caused a large expenditure to restore the depleted stock of fish, an expenditure which would be in vain if the General Assembly is powerless to authorize the prompt abatement of fishing nets at the inlets during the months when the fish return to lay their eggs, or to authorize such penalties, including the forfeiture of the nets illegally used, as the representatives of the people may deem necessary to suppress the nuisance.

The same ruling, as in *Lawton v. Steele, supra,* was made in Wisconsin, in a very able opinion by *Cassoday, C. J.,* (1896) *Bittenhaus v. Johnston,* 32 L. R. A., 380. *Lawton v. Steele* has been recently quoted and followed. *Burroughs v. Eastman,* 101 Mich., 426, and *Osborn v. Charlevoix,* 114 Mich., 655; 13 Am. & Eng. Enc., (2nd Ed.), 573, 576, 579 and notes. The plaintiff relies on *Colon v. Lisk,* 153 N. Y., 188, 609, but that case fully recognizes and follows *Lawton v. Steele,* originally decided by the same court, and merely

holds that an extension of the same summary power to the seizure and sale of vessels was not necessitated by the same urgency as was requisite as to nets in the water and that there should be condemnation proceedings before sale. Presumably it were better as to articles of that value and nature, that the right to sell should be adjudicated before sale.

As to the nets, the plaintiff (had he not admitted his violation of law) without detriment to his rights could have contested the nets having been set within the forbidden limits or that they had been so used with his consent, or set up any other defense, in this proceeding of claim and delivery, or by an injunction to prevent a sale, or by action to recover the proceeds of sale and damages. On the other hand, the General Assembly had the power to authorize prompt abatement of the nuisance by seizure and sale of the nets, subject to the right of their owner to contest the fact of his violation of the law, by this, or any other of the remedies just enumerated.

As against the person actually creating the nuisance, it may be abated without notice. *Jones v. Williams,* 11 M. & W., 176; Garrett on Nuisances, 314. Such is the law, recognized even as far as India. Ratanlal & Dharajlal Eng. & Indian Law of Torts, 403. Besides in this case, notice was actually given before removing the nets, and the plaintiff neither removed nor offered to remove his nets from the forbidden waters, though given the opportunity to do so by the notice given him by the defendant. The plaintiff has had his day in court by this very proceeding in claim and delivery and the nets are not yet sold. It is no deprivation of any right that he is the actor, the plaintiff, since (as the United States Supreme Court said in *Lawton v. Steele, supra,*) the burden is on the defendant to justify the seizure. It is not a question of right but merely as to the form of legal procedure, whether the violator of the statute shall be plaintiff or defendant in the action, and as to that surely the Legislature is the judge.

As was said in State v. Lytle, 138 N. C., 741, "A statute will never be held unconstitutional if there is any reasonable doubt,"—citing *Sutton v. Phillips,* 116 N. C., 504. Can we say that an act is unconstitutional "beyond a reasonable doubt" when such legislation has been held constitutional by the Supreme Court of the United States and by the highest courts of New York, New Jersey and Wisconsin?

If the nets cannot be forfeited, then by having two sets of nets the plaintiff can replace his nets as fast as the officer carries the other off, and then in turn put in the first net when the second is seized. Thus the attempt to abate the nuisance would become a mere farcical race between the violator and the officer of the law. There is no analogy between the prompt seizure of property when required by reasons of public policy, when the rightfulness of such seizure can be afterwards investigated, and if wrongfully taken the article can be recovered or damages therefor, and the taking of human life which cannot be restored.

In the exercise of the police power, the General Assembly is not restricted to indictment, but may proceed by the summary process of abatement of the nuisance and imposing as a penalty the forfeiture or destruction (as it may deem best) of the article illegally used. An act of the Legislature, which speaks for the people in making its laws, is "the law of the land" unless there is a provision of the Constitution which forbids it to enact such law. We look in vain in that instrument for any provision which forbids legislation in furtherance of the police power, authorizing summary process of seizure of nets and their forfeiture when used in open violation of law. The right of seizure and destruction of the nets is not seriously denied. For a stronger reason then the alleged violator of the law cannot complain of the "sale at public auction" as that presupposes advertisement and delay, during which time, he can (as was done in this case) bring claim and delivery and recover the nets, if not used illegally,

whereas if summarily destroyed, his sole remedy is an action for damages.  He is in better case than if the nets, were destroyed.  In either event, if he is proven to have used the nets illegally, he loses the nets, and it can make no difference to him whether they are destroyed or sold.  The State is not compelled to commit an act of vandalism to be constitutional.  It has found the criminal law an inefficient protection and that deprivation of the nets is necessary to prevent the violation of the law.  The owner of the nets has his day in court to contest the fact of violation, by an action for damages if nets are summarily destroyed, and the additional remedy of claim and delivery if to be sold at public auction.  He has nothing to complain of.

Our steady increase in population renders imperatively necessary the strict enforcement of all measures intended to protect or prevent interference with the sources of food supply for our people.  The sovereign people of the State are in a bad case if they cannot protect the great fishing industry by providing that those who would destroy it by nets set at forbidden and vital places, during the four months proscribed, shall forfeit their nets.  The General Assembly has found, and so says by its statute, that this remedy is necessary to enforce the execution of the law.  Unless this is done the State is in fact utterly powerless to protect that large part of its people who are engaged in or dependent upon the great fish industry in its sounds and along its rivers, and the lawless element who disregard the law forbidding setting of nets, is exempt from control.  The Constitution not having forbidden the Legislature to provide for the destruction or forfeiture and sale (as it may deem best) of nets illegally used, and the owner of the nets having his day in court, either by an action of damages or claim and delivery, this court has no supervisory power to hold that either the destruction of the nets or their forfeiture and sale is the remedy which the Legislature must provide.  That is a matter for its judgment. It may prescribe either remedy or both, and change it by sub-

sequent enactment. The owner, if violating ·the law, has suffered a just punishment. If not violating it, he has his full remedy in court to recover the nets or damages as he may elect.

. In the same way the State takes property under the right of eminent domain and turns it over to a railroad corporation which pays for it afterwards. And this is for the same reason that if litigation must be had and terminated before the taking, it would seriously impair the benefit intended by the exercise of the powers of the State for "the greatest good to the greatest number." For the same reason the United States statutes for the enforcement of the Internal Revenues, secs. 3455, 3457, forfeit articles not lawfully stamped, or stills, etc., illegally used, direct them to be sold and the proceeds paid into the Federal treasury, unless before sale the owner shall proceed, as here, by action to recover the articles on the allegation that there was no illegal user.

There are other United States and State statutes imposing forfeitures. Section 3460, U. S. Rev. Stat., provides that where the value of the property seized is less than five hundred dollars, the property shall be advertised and sold, and the proceeds paid into the treasury, unless the owner (as in this case) comes in and by action asserts his rights. *Conway v. Stannard*, 84 U. S., 404; *Pilcher v. Faircloth*, 135 Ala., 314. Where the amount is over $500, the government after seizure begins regular condemnation proceedings (21 Am. & Eng. Enc., (2nd Ed.), 931, note 12), but the authorities all hold that this is only necessary because the statute requires it, and that when the condemnation is decreed, it relates back to the date of the offense, (*The Mary Celeste*, 2 Lowell, 354; *Henderson's case*, 81 U. S., 44; *N. C. v. Vanderford, supra,*) as the forfeiture accrued then and the title passed to the government at that instant.

Such laws are not to be construed strictly, but reasonably, so as to carry out the intention of the Legislature. *U. S.*

v. *Stowell,* 133 U. S., 12. As is pointed out in *U. S. v. 56 Bbls. of Whiskey,* 25 Fed. Cases, 1075 (No. 15,095), there is a clear distinction between forfeiture of goods at common law in cases of treason and felony, which could take place only after conviction, and a statutory forfeiture of property because of its use for illegal purposes. In the latter case the offender is not on trial, nor before the court, unless he voluntarily comes in as a plaintiff to recover the goods. The statute, says the court, does not make the forfeiture the consequence of his conviction, but of his offense, which is inquired into by a seizure of the property while being illegally used, and proceedings of condemnation if required by statute, and if not, then by its destruction or sale unless the owner seeks an inquiry by claim and delivery or action for damages.

As was well said in *Weimer v. Bunbury,* 30 Mich., 211, there is nothing in the Constitution "that necessarily implies that due process of law must be judicial process. Much of the process by means of which the government is carried on and the order of society maintained is purely executive or administrative. Temporary deprivations of liberty or property must often take place through the action of ministerial or executive officers or functionaries, or even of private parties, where it has never been supposed that the common law would afford redress." Then, after instancing the arrest of a felon, *flagrante delicto,* without warrant, 4 Blk. Com., 292, and a traveler passing over the adjacent field when a public road becomes impassable, it is further said: "Our laws for the exercise of the right of eminent domain protect parties in going upon private grounds for the preliminary examinations and surveys. It may be said that in none of these cases is the deprivation final or permanent, but that is immaterial. The Constitution is as clearly violated when the citizen is unlawfully deprived of his liberty or property for a single hour, as when it is taken away altogether. Estrays were at the common law taken up and disposed of without judicial pro-

ceedings, 1 Blk. Com., 297." Then after mentioning statutes to the same effect by which "the owner of stray beasts might be deprived of his ownership by *ex parte* proceedings not of a judicial character," and the abatement of nuisances by any one injured, who thus becomes "his own avenger or ministers redress to himself, 3 Blk. Com., 5," and distress without a warrant, 3 Blk. Com., 6, and levy and sale for taxes without judicial decree, it is said that the destruction of a nuisance by a private party "is as lawful as if it had been preceded by a judgment of a competent court, the only difference being that the party, when called upon to justify the act, must in the one case prove the facts warranting it, while in the other he would be protected by the judgment." This applies in the present case where the violator of the law is deprived of his net, *flagrante delicto*, but has his remedy, in this action against the officer for the property, if unlawfully taken.

The Supreme Court of the United States, 12 U. S. (8 Cranch), 404, says in this connection: "In the eternal struggle that exists between the avarice, enterprise and combinations of individuals on the one hand, and the power charged with the administration of the laws on the other, severe laws are rendered necessary to enable the executive to carry into effect the measures of policy adopted by the Legislature. To them belongs the right to decide on what event a divesture of right shall take place, whether on the commission of the offense, the seizure or the condemnation. In this instance, we think that the commission of the offense makes the point of time on which the statutory transfer of right takes place."

No Error.

Hoke, J., concurring: I concur in the decision of this case and am of opinion that the act in question is a constitutional exercise of legislative power. It is conceded that fishing in the waters of our sounds is the subject of legislative

regulation, that the Legislature may prescribe the time and method of taking fish, establish closed seasons, prohibit the placing of nets and traps within certain localities, declare such placing a criminal nuisance and direct its summary abatement. When such legislation, however, involves the destruction of private property, it must be limited to the reasonable necessities of the case which calls it forth, and may under given circumstances become the subject of judicial scrutiny and control.

The extreme necessity for this legislation and its beneficent purpose have been clearly and forcibly stated in the principal opinion, and the act, after making the placing of nets in prohibited territory a criminal nuisance, proceeds to direct a sale and forfeiture of the nets when placed in violation of its provisions. This last feature of the act in question is not usually or properly considered a part of the punishment, but as done in abatement of the nuisance, and, unless clearly unreasonable or utterly foreign to the purpose designed, will be upheld by the courts.

Mr. Bishop in his new work on Criminal Law, vol. 1, says of such forfeitures: "Destruction by abatement is a phrase denoting one form of the transmutation to be brought to view in this chapter. It occurs when one permits a thing to become a nuisance which another abates without appeal to the courts * * * If a man so uses his property that it becomes a nuisance, the nuisance is liable to be abated to the destruction, if necessary, of the property * * * Abatable nuisances afford a further illustration. Whenever the subject of property, whether through its owner's fault or not, is in a situation to be a nuisance, it is not strictly forfeited, but the nuisance may be abated to the destruction, if necessary, of the property. Even where a nuisance is created by the commission of a crime, its abatement without judicial proceedings is not punishment, which can follow only the conviction of an offender. On such conviction, the court perhaps usu-

ally, not always, orders the abatement, yet even this is not properly a part of the punishment * * *" Again, to meet a *dictum* that such forfeitures were violations of constitutional guaranties,—for trial by jury, and that no one should be deprived of his property but by the law of the land,—he says: "The better view is pretty plainly antagonistic to this *dictum*. It is competent, on general principles, for the law-making power to declare what shall be a public nuisance and to provide for the forfeiture of the thing which shall become such. The forfeiture may be as well without judicial proceedings as with, and the case is entirely outside such constitutional provisions as those referred to by the learned judge * * * In principle and in conclusion, we appear to have something like the following: Whenever the law, statutory or common, creates a forfeiture of property by reason of particular circumstances attending it, or of its being dangerous to the community, or of any form or position which it assumes, this forfeiture is not to be deemed a punishment inflicted on its owner in the criminal law sense. It is not therefore within constitutional guaranties protecing persons accused of crime." This author further says: "There is a difference between what is on its face a nuisance or otherwise dangerous, therefore to be at sight and *in pais* forfeited or abated like a dog or hog wrongly at large, or a thing laid to obstruct a public way, and an article not in itself harmful, yet made so by the evil purpose of its owner. In this latter case, the owner should have notice," etc. The case before us is declared a nuisance by reason of its placing regardless of the intent of the owner, and may be likened to the instance given of the physical obstruction of a highway.

I believe in case of a hog running at large in violation of an ordinance, our own courts have held that some kind of notice or opportunity to redeem should be given. This, however, can be easily distinguished on the ground that the forfeiture of the hog is clearly not necessary to the purpose of

the ordinance; and this I apprehend is the true principle on which forfeitures of this character can be sustained, whether it is done in abatement of the nuisance and is required by the reasonable necessity of the case.

After much reflection I have come to the conclusion that the act in question is neither unreasonable nor oppressive, and may well be upheld as a lawful and proper forfeiture of the offending property. This is by no means because of the small value of the property seized, but rather because of the vast extent and importance of the industry involved, the large number of people affected, the great difficulty of affording protection by reason of the exposed nature of the place, the impossibility of keeping effective watch, and the ease with which such property can be withdrawn, concealed or replaced by offenders in the prohibited ground. Under all the facts and circumstances of this case, the court would not be justified in declaring that the forfeiture directed in the effort to abate this nuisance is unreasonable and in excess of legislative power.

In some of the decisions it is suggested that the same constitutional provisions, which guarantee the enjoyment of a citizen's property, protect also his life and liberty, and if property can be lawfully forfeited or destroyed by legislative or executive action, the life and liberty of the citizen can be dealt with in like manner. But not so. Such legislation affecting life or liberty would be so clearly excessive and so entirely foreign to the object and purpose of abating a nuisance, that it would at once become the proper occasion for judicial interference. It cannot be likened to the forfeiture of offending property seized "in *flagrante delicto*" and directed in the necessary and reasonable effort to abate a criminal nuisance. The suggestion, I respectfully submit, affords no aid to the proper construction of the statute before us. I concur in the decision of the court.

DANIELS *v.* HOMER.

CONNOR, J., dissenting: It is conceded that no person has a several right of fishery in the public navigable waters of the State. *Collins v. Benbury,* 25 N. C., 277; *Skinner v. Hettrick,* 73 N. C., 53. The Legislature has the right to prescribe regulations regarding the time, manner and means of fishing, etc., in such waters, including the power to prohibit the placing of nets, traps, etc., in such portion thereof as it may deem proper for the protection of the rights of the public; it may declare such nets, etc., as are prohibited, or all nets at certain places or fixed periods, public nuisances, and provide for the summary abatement, by removal thereof. *Hettrick v. Page,* 82 N. C., 63. It is needless to discuss the limitations upon this power because the plaintiff does not question the validity of those provisions of the statute by which it is asserted. I fully concur in the opinion of the Chief Justice in this respect. I also concur in his approval of the policy upon which the statute is based and the end sought to be attained. I dissent from the conclusion that section 9, conferring upon the Oyster Commissioner the power to seize the nets and sell the same at public auction without notice to the owner, either personal or constructive, or any judgment of condemnation by any judicial tribunal after a hearing or any opportunity to the owner to be heard, and the disposition of the proceeds as directed, is valid. The right to pass acts of this character is derived from the police power, which is an essential attribute of all government. Without undertaking to define this somewhat elastic term or fix its somewhat elusive limits, it is sufficient, for the purpose of this discussion, to say that it must be exercised within, and subject to, the constitutional limitations by which the life, liberty and property of the citizen is secured. In a government deriving its powers from the consent of the governed, moving within and bounded by the clearly expressed grants of a written constitution, no germ of arbitrary power is to be found or can have any existence. Each department

of the government must find its power to act in the charter
by which it is created and by which all powers, not delegated,
are reserved to the people. The argument that the act is
valid because no provision is found in the Constitution pro-
hibiting its passage is, I submit with great deference, but
equal confidence, based upon a misconception of the nature
of our government and the fundamental principle upon which
it is founded. *Reade, J.,* in *Nichols v. McKee,* 68 N. C.,
430, says: "The theory of our State government is that all
political power is vested in and derived from the people.
The Constitution is their grant of powers and it is the only
grant which they have made. 'And all powers not therein
delegated remain with the people.' Article 1, section 37.
This last clause will not be found in the former constitution
of the State  *  *  *  It follows that it is not true, as con-
tended for upon the argument, that the Legislature is su-
preme except in so far as it is expressly restrained. How-
ever that may be in other governments, or however it may
have heretofore been in this State, it is plain that since the
adoption of our present Constitution the Legislature, just
like each of the other departments, acts under a *grant* of
powers and cannot exceed them." While the *legislative* au-
thority is vested in the General Assembly, no *judicial* power
is there granted. On the contrary, it is expressly prohibited
to that department and vested in the judicial department.
This is fundamental and never for a moment or upon any
consideration to be lost sight of. Among the clearly ex-
pressed limitations upon each department of the government
we find it declared: "That no person ought to be taken, im-
prisoned or disseized of his freehold, liberties or privileges,
or outlawed or exiled or in any manner deprived of his life,
liberty or property but by the law of the land." Const., Art.
I., section 17. These words, in substance, come to us from
Magna Charta; of them Blackstone says: "They protected
every individual in the nation in the full enjoyment of his

life, his liberty and his property, unless declared forfeited by the judgment of his peers or the law of the land." Com., vol. IV., page 24. Creasy says: "The ultimate effect of this chapter was to give and to guarantee full protection for person and property to every human being that breathes English air." Eng. Const., 151.

The latest commentator on Magna Charta says: "Three aspects of this prohibition may be emphasized: "(1). Judgment must precede execution," etc. McKechnie, Magna Charta, 438. Many definitions of the term "law of the land" have been formulated. *Judge Cooley* is of the opinion that none are more accurate or more often quoted than that of Mr. Webster in his great argument in the *Dartmouth College case.* "By the law of the land is most clearly intended the general law which hears before it condemns; which proceeds upon inquiry and reaches judgment only after trial." This court has adopted, with approval, this definition. *Parish v. Cedar Co.,* 133 N. C., 478. *Mr. Justice Douglas* in that case notes that Mr. Webster in enumerating legislative acts which fall within the condemnation of this provision, includes "acts of confiscation" and "legislative forfeitures" among the intolerable evils to be avoided. The term has been construed to be synonymous with "due process of law," of which it is said "the essential elements are notice and opportunity to defend." *Simon v. Craft,* 182 U. S., 427. While conceding these elementary principles, there appears to have been made, upon some minds, an impression that in the exercise of the police power, especially when applied to the abatement of nuisances, the Legislature is not to be controlled by them. They appear to hold that in respect to this essential and yet easily abused power, the public welfare is paramount, to the security of the citizen, which must be sacrificed upon the slightest suggestion that the public welfare demands it. It is undoubtedly true that the public welfare or "the good of the whole" is paramount, but experience has

brought men to see the truth that the public welfare is pre-
served only when limitations are placed upon the government
and those who make, declare and execute the law. The public
welfare demands the punishment of crime as a means of pre-
vention, but the same public welfare demands that trial by
due process of law and conviction shall precede punishment.
When such limitations are not imposed it is found that "the
grim tradition" is true.

> "I oft have heard of Lydford law,
> How in the morn they hang and draw,
> And sit in judgment after."

I cannot assent to the validity of any legislative enactment
depriving the citizen of his life, liberty or property, which
will not stand the test of the standard fixed by the Constitu-
tion. Discussing the limitations upon the police power, the
author of the latest work on the subject says: "There has
never been a civilized government which has not recognized
and practically acted upon the existence of limitations of the
nature here indicated. For all governments profess to apply
or make law, and the nature of law implies the idea of re-
straint according to intelligible principles of reason. The pe-
culiarity of American jurisprudence and government lies in
the possibility of subjecting legislation to judicial control
with a view of enforcing these principles and limitations."
Freund on Police Power, page 15.

It will be observed that the value of the plaintiff's net is
$60. It is a matter of which we may take notice that a large
number of the people in the section of the State in which
the plaintiff lives are dependent upon fishing for the support
of themselves and their families. There is no suggestion that
the net is, in its construction or use, otherwise than is pro-
hibited by the statute, vicious or unlawful. It is difficult to
see in what respect it is more offensive to the law or injurious
to the public welfare than the mule of a farmer which is tied

to a shade tree, or driven in a manner or at a speed prohibited by some town ordinance. While in such case the owner should not use his property in a manner prohibited by law, it is equally true that he should not, for doing so, be deprived of it otherwise than by the law of the land. The power of the Legislature to prescribe regulations for the use of the public waters is in no respect different from its power to regulate the use of the public highway. The power in both cases comes from the same source and is subject to the same limitations. I would deem it sufficient to state the proposition and be content to rest my opinion in respect to its validity, but for the fact that a majority of my learned associates differ from me. A respectful regard for their opinion, expressed with his usual clearness and force by the Chief Justice, imposes upon me the duty of examining the reasons upon which the conclusion is based and the authorities cited to sustain them. I prefer to rest my opinion upon the provisions of the State Constitution rather than the Fourteenth Amendment. As early as 1787, and among the earliest opinions ever filed by our judges, it was held in *Bayard v. Singleton,* 1 N. C., 5, "That by the Constitution every citizen had undoubtedly a right to a decision of his property by a trial jury. For that if the Legislature could take away this right and require him to stand condemned in his property without a trial, it might with as much authority require his life to be taken away without the formality of any trial at all." In *Hamilton v. Adams,* 6 N. C., 161, *Hall, J.,* says: "It is a principle never to be lost sight of, that no person should be deprived of his property or rights without notice and an opportunity of defending them. This right is guaranteed by the Constitution. Hence it is that no court will give judgment against any person unless such person have opportunity of showing cause against it. A judgment entered up otherwise would be a nullity."

*Daniel, J.,* in *Robinson v. Barfield,* 6 N. C., 391 (420),

DANIELS *v.* HOMER.

says: "The transfer of property to one individual, who is the owner, to another individual, is a *judicial* and not a *legislative* act. When the Legislature presumes to touch *private property* for any other than public purposes, and then only in case of necessity and rendering full compensation, it will behoove the judiciary to check its eccentric course by refusing to give any effect to such acts    *   *   *   Our oath forbids us to execute them as they infringe the principles of the Constitution."

*Ruffin, C. J.,* in *Hoke v. Henderson,* 15 N. C., 1, said: "But to inflict punishments after finding the default, is to adjudge; and to do it *without default* is equally so, and still more indefensible. The Legislature cannot act in that character, and therefore, although this act has the *forms* of law, it is not one of those *laws of the land* by which alone a freeman can be deprived of his property. Those terms "law of the land," do not mean merely an act of the General Assembly. If they did, every restriction upon the legislative authority would be at once abrogated   *   *   *   In reference to the infliction of punishments and divesting of the rights of property, it has been repeatedly held in this State, and it is believed, in every other State of the Union, that there are limitations upon the legislative power, notwithstanding those words; and that the clause itself means that such legislative acts, as profess in themselves directly to punish persons or *to deprive* the citizen *of his property,* without trial before the judicial tribunals, and a decision of the matter of right, as determined by the laws under which it is vested, according to the course made and usages of the common law as derived from our forefathers are not effectually "laws of the land" for those purposes.

While the opinions filed do not seriously controvert these elementary principles, they hold that the plaintiff has no right to invoke them in this case and can claim no protection by virtue of them. That as to him they are pure abstractions,

for that he and his nets are outlawed by legislative enactment. This holding is based upon the following propositions:

1. That the Legislature in the exercise of the police power may authorize the summary abatement of a public nuisance, and, if necessary to that end, direct the destruction of the offending property.

2. That the right to destroy includes the right to condemn and sell by summary action, without notice, or judgment of forfeiture and condemnation.

3. That such summary forfeiture and condemnation may be enforced by a ministerial officer, because it is directed to and operates upon the property and not as a punishment or penalty imposed upon the owner for violating the law.

4. That if the owner is entitled to a hearing and judicial determination of his rights, he may obtain it by resorting to the courts in any appropriate action, and that he is not entitled to demand that due process be provided in the statute.

I propose to discuss these propositions in the order in which they are stated. Before proceeding to do so, it will be well to state some elementary principles which always control courts in passing upon the constitutionality of statutes. "We can declare an act of the Assembly void when it violates the Constitution clearly, palpably and plainly and in such manner as to leave no doubt or hesitation on our minds." *Sharpless v. Mayor,* 21 Pa. St., 147. "The words of the Constitution furnish the only test to determine the validity of the statute and all arguments based on general principles outside the Constitution must be addressed to the people and not to us." *Ibid.* While courts may not declare an act void because in their opinions it is unwise, so, on the contrary, they may not strain the words of the grant to sustain an act because they deem it wise. While we are to keep a watchful eye, clear mind and firm hand upon every threatened invasion of the constitutional guaranties of the citizen,

we are to accord to the several departments of the government, and those who may administer to them, the same jealous regard in that respect which we ourselves exercise. *State v. Barrett,* 128 N. C., 630. When an unusual or extraordinary power is asserted by the government, or unusual and extraordinary method, contrary to the procedure and course of the common law, is prescribed by which the right of the citizen, either in respect to his person or property, is invaded, every reasonable doubt must be construed against the asserted power and mode of procedure and in favor of the right of the citizen to demand that he be tried by due course of law. As in England, all language in grants are to be construed most strongly in favor of the King, so in North Carolina all such language must be construed most strongly in favor of the people—the sovereigns. With these rules for guidance, I proceed to discuss the propositions and ascertain how far they may be sustained and applied to the facts in this record.

The right to abate a private nuisance, or a public nuisance, when specially injurious to a private person is of course conceded. The extent to which a person may go in doing so, is fixed by the necessity of the occasion, taking into consideration the character of the nuisance, the means by which it is created or maintained, the imminence of the danger, 'the character and extent of the injury, etc. This right a person has in a state of nature, entirely independent of municipal law, and when he enters into the social or political state, this right is not surrendered but recognized and regulated by the principles of the common law. The Legislature may, upon the same principle, authorize ministerial officers to abate public nuisances and may authorize the destruction of the offending property when necessary for the public welfare or safety. The power is based upon the same reason and controlled by the same limitations—necessity. It is difficult and not necessary in this discussion to define or attempt to mark the limits of this power. It is sufficient to say that it is not

arbitrary, but is within judicial control. The latest work on the police power thus states the law: "When the condition of a thing is such that it is imminently dangerous to the safety, or offensive to the morals of the community, and is incapable of being put to any lawful use by the owner, it may be treated as a nuisance *per se*. Actual physical destruction is in such cases not only legitimate, but sometimes the only legitimate course to be pursued. Rotten or decayed food or meat, infected bedding or clothing, mad dogs, animals affected with contagious diseases, obscene publications, counterfeit coin and imminently dangerous structures are the most conspicuous instances of nuisances *per se*." Freund on Police Power, sec. 520. There are many cases in our reports, restricting this power, not necessary to be noticed here for the double reason that the statute under discussion does not direct the destruction of the nets—nor does it declare them to be public nuisances either *per se* or when used in violation of its provisions. There is not the slightest suggestion that the nets are, either of themselves, or when put into the prohibited waters, public nuisances. I attach no great importance to this fact, except to show, as I shall undertake to do, that in the cases relied upon to sustain the opinion of the court, the property was, by its illegal use, declared by the statute to be a public nuisance.

The right to direct the removal of nets used in violation of law is sustained in *Hettrick v. Page,* 82 N. C., 65, in which *Smith, C. J.,* says that no unnecessary damages must be done to the property removed. *Rea v. Hampton,* 101 N. C., 51. No case can be found in our reports authorizing the destruction of nets. I might safely concede the right of the Legislature to direct their destruction by way of abating the nuisance, but I do not find any evidence in the record that such destruction was reasonably necessary. It is claimed that the right to destroy has been settled by the courts and from this right the power to sell without due process of law is said to

follow. In *Weller v. Snover,* 42 N. J. L., 341, it was held
that a statute authorizing the destruction of a fish-basket
placed in a stream prohibited by law was valid. In the
statute it was expressly required that the fish warden shall
first give notice in two newspapers, and the owner is given
ten days within which to remove the baskets which are de-
clared to be common nuisances. In *Am. Print Works v. Law-
rence,* 21 N. J., 248, cited in the opinion, no question of
police power or of nuisance was involved or passed upon.
The plaintiff sued the defendant, Mayor of New York, charg-
ing that he caused its storehouse and the goods therein
to be blown up with gun powder and destroyed. The defend-
ant justified by alleging that a fire was raging and it became
necessary to destroy plaintiff's property to prevent its spread-
ing, etc. The court, after defining the right of eminent
domain, said: "But the right to destroy property to prevent
the spread of a conflagration, rests upon other and very dif-
ferent grounds. It appertains to individuals, not to the
State. It has no necessary connection with or dependence
upon the sovereign power. It is a natural right existing
independent of civil government." The weight to be given
this case as an authority is lessened by the fact that the
decision was reversed by the court of Errors and Appeals, 21
N. J., 714. There were several cases growing out of a disas-
trous fire in New York. It will be found that the judgment
of reversal was in *Hale v. Lawrence,* See Rep., note page 716.
Without going into the facts and the able discussion of the
law by the court upon the very interesting question presented,
it is sufficient to say that the case does not involve or decide
the principles presented in our case. In *Bittenhaus v. John-
son* (Wis.), 32 L. R. A., 380, the statute declared the nets in
prohibited waters a public nuisance and directed their de-
struction. The act was upheld, relying upon *Lawton v.
Steele,* which will be noticed later. *Burroughs v. Eastman,*
101 Mich., 428, was an action for an assault committed in the

arrest of the plaintiff and has no bearing upon this case. The cases cited, with the exception of *Lawton v. Steele,* 119 N. Y., 226, are the only ones in which the right to destroy fish nets has been sustained. In that case nets found in the public waters are declared to be public nuisances, and their destruction authorized. *Andrews, J.,* says: "We regard the case as very near the border line, but we think the legislation may be fairly sustained on the ground that the destruction of the nets so placed is a reasonable incident of the power of the abatement of the nuisance. The owner of the nets is deprived of his property * * * as incident to the abatement of the nuisance * * * But the general rule undoubtedly is that the abatement must be limited by necessity, and no wanton or unnecessary injury must be committed. 3 Bl. Com., 6. It is conceivable that nets illegally set could, with the use of care, be removed without destroying them. But in view of their position, the difficulty attending their removal, the liability to injury in the process, their comparatively small value, we think the Legislature could adjudge their destruction as a reasonable means of abating the nuisance." There is here a clear recognition of the only principle upon which the right can be sustained—*necessity incident to the abatement of the nuisance.* This case was carried by writ of error, to the Supreme Court of the United States, and is reported in vol. 152, U. S. R., 133. It is claimed that the question raised by the plaintiff is settled by that decision. It is also said that plaintiff's contention is based upon the Fourteenth Amendment, and that the construction put upon its language by the Supreme Court of the United States, controls this court. If the premise be correct, I admit the conclusion. I am at a loss to see why it is necessary for a citizen of this State to resort to the Federal Constitution to protect him in the right to demand that his property be taken from him only by the law of the land or due process of law. I am not willing to make such concession. This right is

guaranteed him as a citizen of the State, and it is in respect to his status as such and right secured to him by the Constitution of the State that he prosecutes this action. Certainly any decision of the Supreme Court of the United States construing language found in both the State and Federal Constitutions, is entitled to the most weighty consideration. The Supreme Court of Ohio, in *Edson v. Crangle,* did not hesitate to follow its own conclusion upon this identical question, although *Lawton v. Steele* was pressed upon their attention. The value, therefore, of that case as an authority is dependent upon the reasoning of the opinion and the unanimity of the judges. After laying down the general principles applying to such cases, the court proceeds to say that many articles, such as dice, cards and other articles used for gambling purposes, may become nuisances by being put to illegal purposes, concluding: "It is true that this rule does not always follow from the illegal use of a harmless article." After further discussion it is said: "It is true there are several cases of a contrary purport. Some of these cases, however, may be explained upon the ground that the property seized was of considerable value." A careful reading of the opinion impresses my mind with the conviction that the decision is to a very large extent based upon the last suggestion—the value of the property. The nets were worth $15 each. The Chief Justice wrote a strong dissenting opinion in which Justices Brewer and Field concurred. He said: "Fishing nets are in themselves articles of property entitled to the protection of the law, and I am unwilling to concede to the Legislature of a State, the power to declare them public nuisances, even when put to a use in a manner forbidden by the statute, and on that ground to justify their abatement by seizure and destruction without process, notice or the observance of any judicial form * * * It is not doubted that the abatement of a nuisance must be limited to the necessity of the occasion, and, as the illegal use of fishing

nets would be terminated by their withdrawal from the water and the public be fully protected by their detention, the lack of · necessity for the arbitrary proceedings prescribed seems to me too obvious to be ignored.   Nor do I perceive that the difficulty which may attend their removal, the liability to injury in the process, and their comparatively small value, ordinarily affect the principle or tend to show their summary destruction to be reasonably essential to the suppression of their illegal use.   Indeed I think the argument is to be depreciated as weakening the importance of the preservation, without impairment, in ever so slight a degree, of constitutional guaranties."   Mr. Freund well says: "The principles which govern the forfeiture of property were departed from in the decision of the New York Court of Appeals, and the Supreme Court of the United States in the case of *Lawton v. Steele* * * *   The chief argument relied upon was the trifling value of the property taken and the disproportionate cost of condemnation proceeding, is an inadmissible argument when constitutional rights are involved."   Without conceding that the value of the property should be considered in the decision of the case, I should not hesitate to say that if considered, it would not weigh against the plaintiff.   To a fisherman on our coast, a net worth sixty dollars is not of so inconsiderable value that a court should dismiss his controversy as beneath its dignity.   We know from observation that thousands of our people are dependent upon the use of property of no more value for their support—the value of the average mule is but little, if any larger, and the tools and implements of many mechanics with which they earn the support of their families, is much below sixty dollars.   It is proper to say that no such suggestion found any favor with any member of this court.   I notice it only because I concur with Mr. Freund that it was the "chief argument relied upon" and with the Chief Justice that it weakens the preservation of constitutional guaranties.   In a very able brief

filed in *Edson v. Crangle, supra,* the decision is referred to as "remarkable" and as "absolutely inconsistent with earlier decisions rendered by former judges of that court." When I say that neither the reasoning nor the authorities cited in this case are convincing to my mind, I am sustained by the strongly expressed dissent of the Chief Justice and two of his associates. The right to abate nuisances, by summary destruction of the offending property, is founded upon necessity, and is confined either to those things which are nuisances *per se,* or in the continued existence of which the danger to the public is imminent, or which endangers public morals and is limited, as said by Chief Justice Fuller, "to the necessity of the occasion." When destroyed pursuant to law, it is an assertion and exercise by the State of a right which the citizen has by the law of self protection. The language quoted by *Mr. Justice Hoke* from Bishop, 1 Crim. Law, applies solely to abatement by destruction. He says: "If a man so uses his property that it becomes a nuisance, the nuisance is liable to be abated to the destruction, if necessary, of the property." This is consonant with the authorities. There is not a word or suggestion to be found in the statute tending to show that, in the opinion of the Legislature, destruction of the nets was necessary as an incident to the abatement of a nuisance. The contrary is manifest from the direction to the officer to sell them. This removes them far beyond the domain upon which, alone, their destruction could be justified. Certainly if I am correct in saying that they may not be destroyed, it will be conceded that there is no possible justification for selling them without due process of law. I earnestly contend that if they come within the power of the officer to destroy, it would not follow that they could be sold as directed by the statute.

I will discuss the second and third propositions together. The right to declare the property used in violation of law forfeited, and to sell the same, is based upon an entirely

different principle from the right to destroy. Mr. Freund says: "The power of summary abatement does not extend to property in itself harmless, but which is put to unlawful use or is otherwise kept in a condition contrary to law * * * The unlawful use may, however, be punished and the punishment may include a forfeiture of the property used to commit the unlawful act. While in many cases this would be an extreme measure, it is subject to no express constitutional restraint, except where the Constitution provides that every penalty must be proportionate to the offense * * * Such forfeiture is not an exercise of the police power but of the judicial power, i. e., the taking of the property does not strictly subserve the public welfare, but is intended as a punishment for an unlawful act. Hence, forfeiture requires judicial proceedings, either personal notice to the owner or at least a proceeding *in rem* with notice by publication. Secs. 525-526. Mr. Tiederman (State & Fed. Con., 825,) says that forfeiture may be declared "as a penalty for the infraction of the law * * * But in all of these cases, the seizure and the destruction must rest upon a judgment of forfeiture procured at the close of the ordinary trial in which the owner of the property has had full opportunity to be heard in defense of his property." In *Colon v. Lisk,* 153 N. Y., 188 (60 Am. St. Rep., 609), discussing a statute having a provision somewhat similar to ours, the court said: "That the forfeiture used in violation of this statute, is in effect a penalty, we have no doubt." The power to declare a forfeiture and sell property used in violation of a statute, without notice or an opportunity to be heard or judgment of condemnation was denied by this court as early as 1816.

In *Shaw v. Kennedy,* 4 N. C., 591, an ordinance of the town of Fayetteville authorizing the town constable to "take up and sell all hogs found running at large in any of the streets of the town and paying one-half of the proceeds to the town treasurer and the other half to apply to his own use" was

held unconstitutional. The court, by *Seawell, J.,* said: "The law of the land * * * allows to every person the opportunity of defending his property before it is condemned; and in no case leaves it to the mercy of a mere ministerial officer to seize it at will; which seizure is to be lawful or not, according to his own will and pleasure. The ordinance was therefore, on that account, unauthorized and consequently void." That was an action of trespass against the town constable for taking up the plaintiff's hogs. Judgment was for the plaintiff, although it appeared that the hogs were running at large in violation of the ordinance.

In *Hellen v. Noe,* 25 N. C., 493, the case is cited, approved and distinguished, *Daniel J.,* saying: "But in this case the ordinance does not attempt to deprive the owner of his property; provides for his having notice, and secures to him every right which he can claim, not inconsistent with the object of the ordinance, the prevention of mischief to the community." In that case the officer was required to give public notice and the owner was entitled to come forward and take his property and pay the officer's charges only, or if a sale took place the purchase money, after deducting the costs, was to be held for the owner. The same ordinance was before the court in *Whitfield v. Longest,* 28 N. C., 268, the only question then decided being that it applied to non-resident owners of hogs. In *Rose v. Hardie,* 98 N. C., 44, cited by the court, the ordinance required notice to be given by the constable "at the court house door, in the best manner he can," giving the ear marks, or other distinguishing marks, and if the owner called for the same within three days, prove his or her property, pay for each hog or goat the sum of one dollar as a penalty for suffering it to run at large, and also fifty cents for the marshal's fee for impounding, and ten cents a day for keeping, he shall have his property, etc. In *Broadfoot v. Fayetteville,* 121 N. C., 421, the same ordinance was before the court upon the question of its application to non-resident

owners. Sections 2811, 2815, 2817, of The Code provide that where the stock law prevails, it shall be unlawful for any person to permit any live stock to run at large. That any person may take up and impound any live stock running at large, etc., and demand the amount fixed by the statute for impounding and keeping such stock. Before any sales shall be made, if the owner of said stock be known to such impounder, he shall immediately inform such owner where his stock is impounded and he shall have two days within which to redeem his property and upon failure to do so, such impounder shall give twenty days' notice of sale and shall from the proceeds pay the expenses and the balance he shall turn over to the owner, if known, and if not known to the school fund, in which case the owner shall have six months within which to call for the money.

With a single exception, I have been unable to find any statute in our Code which confers the power upon a ministerial officer to destroy the property of the citizen without due process. Section 1049-1050. Section 2500 of The Code, authorizing the killing of dogs that kill sheep, provides that the owner shall have notice and satisfactory evidence of the charge be produced before a justice of the peace. It is true that statutes and town ordinances have been sustained, empowering the destruction of dogs without a collar, and upon which the tax has not been paid. These cases are put upon the ground that they are a menace to the public safety. Some of the judges have also sustained the power because they were not property. The tax imposed is not a property tax, but a license for the privilege of keeping them. *Sentell v. N. O. R. R.,* 166 U. S., 698; *Mowery v. Salisbury,* 82 N. C., 175. We held in *Parish v. Cedar Co.,* 133 N. C., 478, that an act which provided that when the owner of swamp land failed to pay the taxes assessed thereon such land should be forfeited to and vested in the State without any judicial proceeding, was unconstitutional. *Mr. Justice Douglas* said that

the decision was based exclusively upon the provisions of the State constitution. Bill of Rights, section 17. This case was approved in *Lumber Co. v. Lumber Co.*, 135 N. C., 742. I am at a loss to see how the decision of this case can be reconciled with *Shaw v. Kennedy, supra.* An exhaustive examination of the decisions of other courts fails to disclose a single case in which the power of the Legislature to declare a forfeiture and direct a sale of property without due process is sustained. On the contrary, the decisions are uniform in the denial of any such right or power. Time and space permit the notice of only a few of the many cases in which the power is denied. In *Ieck v. Anderson,* 57 Cal., 251, *McKee, J.,* said: "But the statute under consideration contained no provision whatever for determining whether the property was liable to condemnation for the forfeiture denounced against it for the criminal acts of those who had it in their possession. It merely authorized a peace officer to seize the property without warrant or process, to condemn it without proof, or the observance of any judicial forms and to destroy it without notice of any kind, or sell it upon notice posted anywhere in the county for five days. Such an enactment cannot be harmonized with those constitutional guaranties which are supposed to secure every one within the State in his rights of liberty and property." After citing authorities, he concludes: "It follows that so much of the statute under consideration as authorized defendant to arbitrarily seize and destroy or sell the property of the plaintiff for alleged forfeiture, without judicial proceeding for its condemnation or monition or notice actual or constructive to its owner * * * was unconstitutional and void." *State v. Robbins,* 124 Ind., 308. In *Edson v. Crangle,* 62 Ohio St., 49, a statute prohibiting the placing of nets in certain public waters was under discussion. In regard to a section substantially like section 9 of our act, *Burkett, J.,* for the court, said: "While the seizure may be made in the first instance by

an officer of the law doing no unnecessary damage, the confiscation must be made by the judgment of a court having jurisdiction of the subject matter. This section gives the right of confiscation, but fails to provide a legal proceeding by which the confiscation may be adjudged, and there being no other statute providing in like cases, it attempts to take and sell private property and place the proceeds in the public treasury without any process of law." The statute was held unconstitutional, the opinion concluding, "Proper legal proceedings are always necessary to adjudge a forfeiture or confiscation and to permit officers to seize, sell and appropriate private property without legal proceedings under a claim of confiscation, would be inconsistent with the principles of constitutional government and would soon lead to fraud, corruption, oppression and extortion." This case is strikingly like the one before us. The action was by the owner for the possession of his net detained by the officer. The court held that he was entitled to recover. The case was argued upon full briefs by the Attorney-General and other eminent counsel. The Supreme Court of Maine, in *Dunn v. Burleigh*, 62 Me., 24, in passing upon a statute prohibiting trespassing upon public lands and empowering a land agent to seize the team of the trespasser and sell the same by giving notice in newspapers, etc., said: "Will any one contend that it is competent for the Legislature to pass an act authorizing the land agent to seize the person of a trespasser upon the public lands and hang him, or imprison him for life without any other trial of his guilt than the *ex parte* determination of the land agent himself, and no other authority than his own personal command? Of course not. No more is it competent for the Legislature to pass an act authorizing the land agent to deprive a person of his property in such a summary mode; for what is due process of law in the one case must be equally so in the other. In the Constitution, life, liberty and property are all grouped together, and the same protection which is

secured to one is secured to all." *Lowry v. Rainwater,* 70
Mo., 152; *King v. Hayes,* 80 Me., 206. *Osborn v. Charle-
voix,* 114 Mich., 655, cited in the opinion fully sustains my
view and notes the very distinction for which I am contend-
ing. *Montgomery, J.,* on page 663, says: "It is clear that
this act permits the seizure of nets and apparatus, but only
when the same are found in actual use. It is also plain
that the warden has no right to destroy the same until ordered
by the court before whom the offense is tried, and by this we
understand is meant the court before whom the person offend-
ing is tried for the unlawful use for which the apparatus is
seized; and it is implied that the disposition of the property
is to be determined in that proceeding to which the offender
is a necessary party and in which he has a right to be heard."
The entire opinion is based upon this distinction—the officer
may seize and remove the net, but he cannot destroy or sell
until some judicial proceeding is had or at least an oppor-
tunity be given the owner of the property to be heard. The
question involved underwent an exhaustive examination by
the Supreme Court of Massachusetts in *Fisher v. McGill,* 11
Gray (67 Mass.), 1, in which Rufus Choate, then Attorney-
General, was of counsel, and *Chief Justice Shaw* wrote the
opinion for a unanimous court of exceptional ability. Cer-
tainly from this source we may draw sound doctrine. The
Legislature for the purpose of suppressing the liquor traffic
enacted a statute, containing provisions similar, but not so
barren of protection to the citizen as ours. The right to
regulate or to prohibit the traffic was fully conceded. The
only question involved was the mode of procedure, leading
to condemnation of property. It is thus stated by the *Chief
Justice:* "The question is whether the measures directed and
authorized by the statute in question are so far inconsistent
with the principles of justice and the established maxims
of jurisprudence, intended for the security of public and pri-
vate rights, and so repugnant to the provisions of the Dec-

laration of Rights and Constitution of the Commonwealth, that it was not within the power of the Legislature to give them the force of law and that they must therefore be held unconstitutional and void; and the court are all of the opinion that they are." After noting other objections to the statute he says: "Then the property may be confiscated and destroyed without any opportunity given the true owner to be heard. But suppose the officer happens to be right, and the owner has notice, the notice is to appear forthwith. No day in court is given, no allowance made for the contingency of the owner's absence or sickness or engagements   *   *   * These measures seem wholly inconsistent with the right of defending one's property and of finding a safe remedy in the laws  *   *   *  Now, we can perceive no provision for the trial and proof of this offense of keeping liquors with illegal intent in any sense in which a judicial trial is understood, in which a party charged with an offense, for which his property may be taken from him and confiscated, may stand on his defense and have the presumption of innocence until proofs are adduced against him to establish the crime or misdemeanor, with which he is charged. Such a trial alone can satisfy the express provisions of the Declaration of Rights, which declares that no subject shall be   *   *   *  but by the judgment of his peers or the law of the land. These expressions have been understood from Magna Charta to the present time to mean a trial by jury in a regular course of legal and judicial proceeding."

In *Varden v. Mount,* 78 Ky., 86, an ordinance authorizing the marshal of a town to seize all hogs running at large and sell them was held void, for that no provision was made for giving notice to the owner, the court saying: "This is the general rule, and it is only in extreme cases, where the preservation and repose of society or the preservation of the property rights of a large class of the community absolutely require a departure that the courts recognize any exception.

The exception can only be sustained upon 'an overruling necessity.'" The same was held in *Donovan v. The Mayor,* etc., 29 Miss., 247.

In *Heis v. Town Council,* 6 Rich., 404, it is said: "A man's property cannot be seized except for violation of law, and whether he has been guilty of such violation cannot be left to police officers or constables to determine." In *Bradstreet v. Neptune Ins. Co.,* 3 Summer, 601, *Judge Story,* referring to a *proceeding in rem* in which no notice is given, says: "It amounts to little more in common sense and common honesty than the sentence of the tribunal, which first punishes and then hears the party."

In *Poppen v. Holmes,* 44 Ill., 360, the plaintiff's horse had been seized while running at large in the town in violation of the ordinance authorizing a sale by the pound master thereof, if the costs, etc., were not paid. Plaintiff brought replevin. Defendant justified under the ordinance. The ordinance was declared void because no provision was made for hearing. In *McConnell v. McKillip* (Neb.), 65 L. R. A., 610 (1904), the statute prohibited hunting or fishing without a permit, and declared that all guns, etc., in actual use by any person hunting or fishing without such permit should be forfeited to the State. The commissioner appointed to enforce the statute was authorized to seize and sell such gun, etc., and pay the proceeds into the school fund. The plaintiff being engaged in hunting without a license, his gun was seized by the officer. He brought an action to recover possession of his property, alleging that the statute in so far as it authorized the seizure and sale of his property without a hearing, was void. The court by an opinion concurred in unanimously, sustained his contention assigning the same grounds upon which this dissenting opinion is based—concluding: "There is a clear and marked distinction between that species of property which can only be used for an illegal purpose and which may therefore be declared a nuisance and

summarily abated, and that which is innocent in its ordinary and proper use, and which only becomes illegal when used for an unlawful purpose. We know of no principle of law which justifies the seizure if innocent in itself, its forfeiture and the transfer of the right of property in the same from one person to another as a punishment for crime without the right to a hearing upon the guilt or innocence of the person charged before the forfeiture takes effect. If the property seized by a game keeper or warden were a public nuisance, such as provided for in section 1, he had the right under the duties of his office at common law to abate the same without judicial process or proceedings; and the great weight of authorities is to the effect that such common law rights have not been abrogated or set aside by the provisions of the Constitution; but if the property is of such a nature that though innocent in itself and susceptible of a beneficial use, it has been perverted to an unlawful use, and is subject to forfeiture to the State as a penalty, no person has the right to deprive the owner of his property summarily without affording opportunity for a hearing and without due process of law. The usual course of proceeding in such case has been either as in admiralty or revenue proceedings to seize the property, libel the same in a court of competent jurisdiction and have it condemned by that court or as in criminal matters to arrest the offender and to provide that upon his conviction the forfeiture of the property to which the offender's guilt has been imputed and to which the penalty attaches should take place. These have been the methods of procedure for centuries." This is the latest discussion and decision of the question involved. See also *Boggs v. Comm.,* 76 Va., 989; *Colon v. Lisk, supra.*

*Walker, J.,* in *Dorman v. State,* 34 Ala., 116, said: "If life, liberty and property could be taken away by the direct operation of a statute, the enjoyment of these rights would depend upon the will and caprice of the Legislature and the

provision would be a mere nullity. Thus construed the Constitution would read 'no person shall be deprived of his life, liberty or property unless the Legislature pass a law to do so.'" The doctrine is well stated by *Judge Cooley* (Const. Lim., 7 Ed., 518): "Nor can a party by his conduct so forfeit a right that it may be taken from him without judicial proceedings in which the forfeiture shall be declared in due form. Forfeitures of right and property cannot be adjudged by legislative act, and confiscations without a judicial hearing after due notice, would be void as not being due process of law." The authorities in addition to those cited are uniform and abundant to sustain these propositions.

1. That the right to destroy property which is a public nuisance, either *per se,* or made so by statute, or becoming so by the manner of its use, is restricted to the necessity of the occasion, or as an incident to the abatement.

2. That the power to declare property forfeited and subject it to sale by reason of its illegal use, is *judicial* and not *legislative*. That it can only be exercised as a penalty or punishment imposed upon the owner for violating the law, and, as a necessary conclusion, the forfeiture and condemnation can only be declared and enforced after a hearing or an opportunity to the owner to be heard.

I have not found it possible, without further extending this opinion, already too long, to comment upon references in the opinion to Internal Revenue Laws. They are not at the best a favorite field for the investigator of authorities to sustain personal or property rights. From the third proposition asserted by the court, I dissent. It is said, Why permit the plaintiff to raise the question of the validity of the statute? He admits that he has violated its provisions: What difference does it make to him whether his net is sold according to law or in violation of law? Assuming that the act is unconstitutional, as I have undertaken to show, the argument proves too much and destroys the right of the citizen

in any case to demand that his life, liberty or property be taken only by "the law of the land." It is said if he has not violated the law, he may show it—if he has, it is a matter of no concern to him that he is punished without due process of law. It is sometimes well to test the strength of a proposition by putting an extreme case. The Legislature fixes the punishment of murder, the Constitution provides that no man shall be put upon his trial for murder except by indictment by a grand jury, or convicted but by the unanimous verdict of a jury. The Legislature, deeming it a useless and expensive proceeding involving delay, etc., authorizes any sheriff or constable, upon being satisfied that a person has committed murder, to forthwith arrest and hang him. The citizen commits the crime, information is duly given, the sheriff proceeds to execute the legislative will; application is made to a judge for a writ of *habeas corpus* in which guilt is admitted. The sheriff finds that this court has decided that by admitting guilt, the petitioner waives or forfeits his right to be hanged, according to the expensive requirements of the law of the land, and so avers in his return to the writ. To the suggestion that the plaintiff may in this action litigate his constitutional rights, it is sufficient to say that the question is not whether in some way, but whether in the act itself or by some general law applicable to all such cases, provision is made for hearing before confiscation. In *Stewart v. Palmer,* 74 N. Y., 183, the same suggestion was made in regard to a revenue law—a statute empowering a board of assessors to assess property for local improvements, without notice to the owner. Application was made for an injunction restraining the enforcement of an assessment upon the ground that no notice was required by the statute. The defendant answered that conceding plaintiff's contention, he was not in a position to insist upon his rights because, in fact, the assessment was fair. *Earle, J.,* said: "The constitutional validity of law is to be tested, not by what has been done

under it, but by what may by its authority be done." It is said in the opinion in chief, in response to the contention of the plaintiff, that before his nets are sold, he is entitled to have the fact determined by a court whether he has incurred the penalty,—"So he has, but it can be asserted in this very action    *    *    *    He has his full remedy, but it does not include a continuance of the nuisance," etc. I am not quite sure that I comprehend the import of this language. The opinion maintains that he has no right to demand a hearing as a condition precedent to the sale of his nets—but it seems by the language quoted that such is not the conclusion reached by the court. Again it is assumed that the right of the Legislature to authorize "the prompt abatement of fishing nets at the inlets" is denied. On the contrary, I concede the right. I concede that the nets may be removed and if necessarily incident to the removal, they may be destroyed. Severe penalties by way of fine, and punishment by way of imprisonment, may be imposed. The only restriction on the power of the Legislature is that such punishment shall not be cruel and unusual. I concede further that as a part of the punishment the nets may be sold, etc. The right to do any and all of these things otherwise than by the law of the land—due process of law, I deny. With all possible deference I must be permitted to say that my convictions in respect to the right of the citizen of this State under the Constitution are not shaken by referring to "the law as recognized even as far as India." I have no doubt that in Turkey, Russia and many other jurisdictions in which the rights of the people come *ex gratia* from sovereigns ruling by some supposed Divine right, life, liberty, and property may be taken without any process other than the edict of the sovereign. In the light of the uniform judicial expression to the contrary in this country, I must dissent from the proposition that "in the exercise of the police power the General Assembly is not restricted to indictment, but may proceed by summary process of abate-

ment of the nuisance and imposing as a penalty the forfeiture or destruction (as it may deem best) of the article illegally used." If this is the law, and as the majority of this court so hold it must be the law of this state, I am at a loss to see where the limitations upon the power of the Legislature have any place or virtue. If I am correct in this opinion, this case marks an epoch in our jurisprudence and stands forth as a departure from the ancient landmarks made by the fathers for the protection of life, liberty and property. The decision reverses not only adjudged cases in this court, but the entire conception of our system of government and rules of construction of our Constitution. I write with the utmost respect and deference, but with earnest convictions. The question here is not whether the plaintiff shall be permitted to violate the law or whether the State has the power to prevent, by punishing him, nor is it whether a valuable resource of the State for feeding the people shall be sacrificed, but whether the plaintiff or any other citizen shall be deprived of his property otherwise than by the law of the land. Without regard to the value of his nets or the character of his offense this question is paramount to all others. If the plaintiff may be deprived of his property without due process of law, what guaranty is left that any and all other citizens may not suffer in like manner. It was only at the last term of this court that we found a corporation claiming sovereign power to destroy valuable property to meet a supposed public necessity. *Brown v. Electric Co.,* 138 N. C., 533. At each term we are called upon to stay the hand of power "in its eccentric course" and protect the citizen in his rights. We may not safely listen to the suggestion that public necessity demands that we sustain doubtful power in either department of the government. It is not necessary to go beyond our own time or country or the records of this court to find painful reminders that, except for the protection of these safeguards, men would have been done to death, or imprisoned by executive

and ministerial officers, in defiance of the law of the land. Sure, swift and cheap methods of punishment appeal very strongly to a sometimes dominant sentiment. The protection of the shad fisheries of the Albemarle should be secured and the plaintiff should be compelled to obey the law, but it is neither necessary nor wise to accomplish these desirable results by "weakening the importance of the preservation in ever so slight a degree of constitutional guaranties."

WALKER, J., concurring in dissenting opinion: It seemed to me at first that the plaintiff must fail in his action, as the seizure of the nets for the purpose of removing the obstruction to the free passage of fish and thereby abating a nuisance, was lawful, and the cost and expense of making the removal being therefore a just charge against him, the officer could hold and sell the property and apply the proceeds to their payment, even though he could not retain the surplus for the purpose of being turned into the school fund as directed by the Act of 1905, chapter 292, section 9, the Legislature not having provided for a judicial determination of the fact of forfeiture. This would be so, and I would still be of the same opinion, if the defendant had offered to surrender the nets to the plaintiff upon his paying the reasonable cost and expenses of removing them. *Hellen v. Noe,* 25 N. C., 493. The record shows, however, that this he did not do, but, on the contrary, when the plaintiff demanded possession of the nets, he refused to give them up and insisted on his right to hold and sell them, not only for the necessary cost and expense of their removal from the water, but also in order to apply the surplus to the purpose indicated in the statute. Plaintiff did not tender the costs and charges of such removal, it is true, but the defendant's refusal to comply with his demand for the reason he gave and his virtual denial that plaintiff had any right whatever in the property because it had been forfeited, dispensed with the necessity of any formal

tender by the latter of the amount of the cost and expense incurred by the officer in seizing and removing the nets (28 Am. & Eng. Enc. (2nd Ed.), page 7). The question is then presented, whether the officer had the right to refuse compliance with the plaintiff's demand, for the reason that he was justified by the statute in holding the nets and selling the same, not only to pay the cost and expense of seizure, but to apply the surplus to the school fund. If he claimed too much, his plea of justification cannot be sustained. After the most careful consideration of the question thus raised and an examination of the authorities, my opinion is that the Legis· lature could not decree a forfeiture of the nets by virtue of its own enactment nor without some kind of procedure to determine the guilt of the plaintiff or the liability of his property to forfeiture. There must be some inquiry, having at least the form or semblance of judicial investigation. I therefore concur in the dissenting opinion of *Justice Connor* to this extent and in the conclusion he has reached, that we cannot hold the Act of 1905 to be valid throughout without denying to the plaintiff the right to be heard in defense of his property, which is clearly guaranteed by the Constitution, and without depriving him of that property contrary to the law of the land. Const., Article I., section 17. Forfeitures of rights and property cannot he adjudged by legislative acts, and confiscation without judicial hearing after due notice, is void, as not being due process of law. *Lowry v. Rainwater,* 70 Mo., 152. Broad as is the police power, it is, like every other, subject to the restrictions of the organic law, State and Federal. It is paramount when the particular case falls within its scope, but the Legislature cannot conclusively establish that such is the nature of the case, and the decision of that body may, where there is a plain excess or usurpation, be reversed by the judiciary or rather nullified. This results from the constitutional provision that no man shall be deprived of his life, liberty or property without due process of

law, which would be an idle declaration of right and nugatory, if a bald recital in an act of Assembly could oust the jurisdiction of the courts. 2 Hare's Am. Con. Law., 772. It is the plain duty of the courts to see that the Legislature, in the exercise of its police power, keeps within established constitutional limitations. Tiedman Law of Police Power, section 135. Its power over subjects of police regulation is not unlimited or arbitrary, and it should go no farther in the destruction or confiscation of the rights and property of the citizen, while exercising this power, than is required for the attainment of the end in view. An unnecessary invasion of the rights of the citizen in such a case is an excessive exercise of the power and is unwarranted.

The question is not merely whether the nets were placed in the prohibited waters in violation of the statute, but whether the method by which the title of the plaintiff to his property was attempted to be divested and transferred to another, was without constitutional sanction. *Varden v. Mount,* 78 Ky., 86. It seems clear to me, that the solution of the question we have in hand, cannot be made to depend upon the bare necessity or exigency of the case arising out of the peculiar nature of the property and the facility with which it can be returned to the place in the water from which it was taken, if it should be restored to the possession of the owner. This argument could be applied to most any species of movable property and would practically nullify the provisions of the Constitution which afford protection to the citizen in the possession, use and enjoyment of his property. Besides, the premise upon which the argument is based, ignores the fact that the plaintiff, if so minded, could procure other property of a like kind and continue the obstruction of the stream, but on the contrary, it is assumed that the confiscation of the nets and their sale will effectually abate the alleged nuisance. The sale of the nets does not necessarily put them beyond the owner's reach. The reasoning

will, as well, and with as much force, apply to other kinds of property as to fish nets. They cannot be replaced in the water and again be employed in their unlawful use with any more ease, or any less secrecy, than can the master return his vessel, which has been used in unlawfully taking oysters from their beds, to the place of its former depredations and continue in his illegal business, and it must be conceded that the vessel cannot be destroyed or forfeited, unless absolutely necessary to suppress the wrong. *Boggs v. Com.,* 76 Va., 989; *Colon v. Fisk,* 153 N. Y., 188. The vessel is a larger object and can be better seen at its work, but if the nets are used for catching fish, which must at stated periods be taken from them, the publicity is just as great in the one case as in the other. The argument is founded upon a principle of preventive, rather than upon one of retributive or punitive justice. But if the nuisance can be abated, or the obstruction, which constitutes the nuisance, can be removed from the waters, has the State any more power to take property to prevent a repetition of the offense, without due process of law, than it has to punish the offender for the act already done? Whatever view we take of the matter, we are constantly confronted by this limitation on the power of the State, that it can exercise none which deprives the owner of his property, except to protect or promote the public interests and then only after due process, unless there is urgent necessity for the immediate destruction of the property. This necessity is not presented when the State merely seeks to prevent the repetition of an offense, except in very rare and exceptional cases not embracing this one, or when she undertakes to declare a forfeiture, for the same purpose and with the same intent as she imposes a penalty or inflicts punishment. It is to be doubted, if it should not be strenuously denied, that the Legislature can even go to the extent of authorizing the destruction of the nets, in which case the argument might be stronger and more effective, without giving the owner an

opportunity to be heard as to the unlawful use of his property, where the necessity to destroy it does not exist. I take it that the right to summarily destroy the property of the citizen for the purpose of abating a nuisance, or in the exercise of any other police power, is confined to cases where the destruction is necessary to effect the abatement or to the full exercise of the police power, and that it does not exist, when, for instance, the nuisance can be thoroughly abated and at the same time the property unlawfully used to create it be restored to the citizen, the right itself being one which arises out of and is commensurate with the necessity and is limited by its demands.

I do not deny that the forfeiture or the destruction of property may not be declared as a penalty or as a punishment annexed to the commission of the unlawful act which constitutes the nuisance, but in such a case it must be admitted that the citizen has a clear and unquestionable right to notice and an opportunity to be heard in his defense. This proposition is too plain for argument and does not call for the citation of authorities, though the latter are abundant. Referring to this question in *Fisher v. McGirr,* 1 Gray, 36, *Shaw, C. J.,* says: "Such being the character of the prosecution, in a high degree penal in its operation and consequences, it should be surrounded with all the safeguards necessary to the security of the innocent. The party should have notice of the charge of guilty purpose upon which his property is declared to be unlawfully held and in danger of being forfeited and a time and opportunity to meet the witnesses against him face to face." The same doctrine is strongly stated by *Judge Story* in *Bradstreet v. Ins. Co.,* 3 Sumner, 601. "It is a rule," says he, "founded on the first principles of justice, that a party shall have an opportunity of being heard in his defense before his property is condemned, and that charges on which the condemnation is sought shall be specific, determinate and clear." In *Windsor v. McVeigh,*

93 U. S., 279, the court says: "The jurisdiction acquired by the seizure of the property is not to pass upon the question of forfeiture absolutely, but to pass upon that question after opportunity has been afforded to its owner, and parties interested, to appear and be heard upon the charges. To this end, some notification of the proceedings beyond that arising from the seizure, prescribing the time within which the appearance must be made, is essential. Such notification is usually given by monition, public proclamation or a publication in some other form. The manner of the notification is immaterial, but the notification is indispensable." In *Mc-Veigh v. U. S.,* 78 U. S., 259, it was said that the right to declare a forfeiture of property must be exercised only in such way as to give the owner an opportunity to appear and defend, and that this right to be heard existed even in favor of a person then within the Confederate lines, whose property was sought to be condemned in a court of the United States. "It was alleged," says *Swayne, J.,* for the court, "that he was in the position of an alien enemy, and hence could have no *locus standi* in that forum. If assailed there he could defend there. The liability and the right are inseparable. A different result would be a blot upon our jurisprudence and civilization. We cannot hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice."

The property of the citizen cannot be seized except for a violation of the law, and whether he has been guilty of such violation cannot be left to police officers or oyster inspectors to determine. *Darst v. People,* 51 Ill., 286. There is no more legislative power to authorize ministerial officers to perform judicial acts of this character than there is to authorize them, at their discretion, to assess a fine upon a citizen and seize his property for its payment without inquiry before a court or an opportunity of being heard in his own defense. *Ibid.,* 287. The right of the citizen in this respect

is strikingly illustrated by the case of *Boggs v. Commissioners,* 76 Va., 989, in which is the following clear statement of the principle: "It is said that the proceedings under the liquor law may be so conducted consistently with its provisions as to secure to the person whose property is seized all his constitutional rights. If this is possible that is not enough. The law must afford to the accused the means of demanding and enforcing his constitutional rights and if it authorized a course of procedure which would deprive him of this, it is void. It is not to be left to the discretion of prosecutor or magistrates to adopt a course of procedure which may or may not be in conformity with the requisitions of the Constitution as they may elect."

It may be conceded that when the necessity of the case, by reason of the situation of the property and the peculiar circumstances, requires its destruction in order to abate a nuisance, the property may be destroyed, and yet it would not justify this defendant, for no such necessity existed here, as the nuisance was fully and completely abated by the removal of the nets from the water and the sale or other disposition of them afterwards by the officer could not therefore make its abatement more effectual or complete. The property of the citizen then was taken from him without notice or hearing, in a case where there was no necessity for doing so in order to accomplish the main purpose of the legislative act. In this connection the language of the court in *Varden v. Mount,* 78 Ky., 86, with reference to a kindred question is peculiarly appropriate: "The right to forfeit without citation and without hearing can only exist from necessity. That right in this instance should not be extended beyond impounding the hogs. · When that is done, the necessity for summary and precipitate action ceases, and judicial proceedings looking to forfeiture may then properly begin. If the ordinance had been violated, appellant may be compelled to pay the fees for impounding and keeping the hogs, but

their payment cannot be enforced by forfeiture without judicial determination."

The police power therefore should be exercised with due regard for private rights and the constitutional safeguards thrown around the rights of property are not to be demolished for any less reason than that the public interests imperatively demand it and no time or opportunity is afforded for their due observance. It is desirable that a way should be left open for the free passage of fish in the sounds, but the benefits to be derived therefrom must be regarded as inconsiderable in comparison with the value of the guaranties of the Constitution, which secure to the citizen his liberty and his property. A full recognition of the right of the State to adopt and vigorously enforce measures for the suppression of nuisances does not ordinarily require any sacrifice of the rights or property of the citizen, and they should, when possible, be made to harmonize with constitutional provisions, and inconsiderate legislation which disregards them should not be upheld. Summary and extreme measures should not be resorted to if, without serious detriment to the public interests, the purpose can otherwise be accomplished. *Lowry v. Rainwater, supra.*

This court was among the first to assert this right of the citizen to be protected in the use and enjoyment of his property, and not to be unreasonably deprived thereof. *Bayard v. Singleton,* 1 N. C., 5. And this case was followed in quick succession by others equally as pronounced in their assertion and vindication of the right of property to protection under the Constitution against forfeiture or any sort of condemnation, contrary to the law of the land or, what is the same thing, without due process of law. *Hamilton v. Adams,* 6 N. C., 161; *Robinson v. Barfield,* 6 N. C., 391; *Hoke v. Henderson,* 15 N. C., 15. In *Shaw v. Kennedy,* 4 N. C., 591, discussing the identical question we are now considering, the court, by *Seawell, J.,* (in words which cannot be too often

repeated) says: "The laws of the land, or, in other words, those laws which do operate over the *whole country* without being directed to any place or particular individual, allow to every person the opportunity of defending his property before it is condemned; and in no case leave it to the mercy of a mere ministerial officer, to seize it at will, which seizure is to be lawful or not, according to his own will and pleasure. The ordinance, therefore, on that account, was unauthorized and consequently void." This case has been cited with approval. *Hellen v. Noe,* 25 N. C., 493. I am unable to perceive any substantial difference between *Shaw v. Kennedy,* and the case now under review. In the former case a migratory hog had strayed into a town and was seized and held as forfeited, under the provision of an ordinance condemning him, as a nuisance, to be sold, and directing the proceeds to be applied to the payment of the cost of impounding him, and the balance to the joint use of the constable and the town, without giving the owner any opportunity to be heard. This was held to be a clear violation of his constitutional right. There was no reason in that case why the hog should not have been forfeited, which does not with equal force apply to the facts of this case. One was an animate and the other is an inanimate thing, but both are property and under the protection of the same law against wrongful invasion.

If the value of the property can be considered in determining whether there is due process of law in the particular case, it should not have any weight with us in the decision of this case, as it does not appear that the value of the nets is less than the cost and expense of removal. Indeed, the inference, if it can be drawn from what does appear, should be that it is not. But I do not think the value of the property has anything to do with the question or that it should affect the application of the principle in the least. The right of the owner is to have it judicially determined that his property has been forfeited, and this determination must necessarily

precede condemnation for any purpose. It can be destroyed to abate the nuisance when the exigency of the situation requires it, because of the paramount right of the State to do so in promotion of the public good, and the interest of the individual will not be permitted to stand in the way. (*Privatum incommodum publico bono pensatur*). This is upon the ground of public policy based upon the maxim that regard is to be had to the public welfare, as the highest law, there being an implied assent on the part of every member of society that his own individual welfare shall, in cases of necessity, yield to that of the community; and that his property shall under certain circumstances be placed in jeopardy or even sacrificed for the public good. Broom's Legal Maxims (8th Ed.), 1. But the emergency must exist before the right can accrue to the State, and if it does not exist the owner is not required to submit to the destruction of his property and it cannot be condemned for any purpose without a hearing. The right of the State depends upon the existence of the necessity for destruction or other summary proceeding, and not upon the value of the property, and surely the State cannot merely condemn the property by forfeiture to its own use or to any public use without a hearing, as there is no necessity for such action. The fisherman's net may be of little intrinsic value, but if it is forfeited the loss to the owner may be far beyond its inherent worth. Whether of great or little value, it is his and cannot be taken from him even by the most powerful, or by sovereignty itself, except in accordance with the law of the land. That is the shield of the humblest as well as of the most exalted citizen. What is said by the court in *Coleman v. Railroad,* 138 N. C., 357, aptly and forcibly expresses this thought: "The plaintiff may be an humble individual and the damages may or may not turn out to be slight. But in the history of English law, many important rights have been declared in similar instances of obscure complainants, and where the wrong was not of great note by reason of its effect in that particular case."